UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------

LIANG WANG,

                    Plaintiff,

        v.

SAMMY SUSSMAN, VOX MEDIA, LLC., AND NEW
YORK MEDIA, LLC,

                    Defendants.

--------------------------------------------------------------------

Index No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Liang Wang, in support of his Complaint against Defendants Sammy Sussman, Vox

Media, LLC, and New York Media, LLC, states the following:

## NATURE OF THE ACTION

1.      This defamation action arises out of Defendants' publication of a false and grossly

misleading article entitled "A Hidden Sexual-Assault Scandal at the New York Philharmonic:

two musicians were fired for sexual misconduct.  Why are they back with the orchestra?" (the

"article").[1]  Plaintiff Liang Wang—the principal oboist of New York Philharmonic—is one of

the "two musicians" who are the subjects of the article.  Sammy Sussman wrote the article,

which was published on April 12, 2024 in "Vulture," an online magazine published by New

York Magazine.

2.      Defendants' purpose in writing and publishing the article was to weave a narrative

that depicts Wang (and another Philharmonic musician, Matthew Muckey) as having committed

a crime against a third musician, Cara Kizer, in Vail, Colorado, in 2010.  Specifically, the article

---

[1] The original version of the article is no longer available online. An updated version published on April
16, which repeats the content of the original article and adds that the article triggered Wang's and
Muckey's suspensions by the Philharmonic, is attached as Exhibit A.

implies that Wang put a date rape drug into Kizer's wine, so that Muckey could sexually assault her.  The article also implies that Wang (in addition to Muckey) was fired by the Philharmonic in 2018 for this supposed conduct against Kizer—and that the two musicians were reinstated only because an arbitrator failed to credit *what the article portrays* as compelling evidence of guilt.

3.     That story is a total fabrication: Wang did not drug Kizer, nor is there any evidence whatsoever for that wildly irresponsible contention.  Moreover, the notion that Wang wanted to drug Kizer so that *someone else* (Muckey) could sexually assault her, is absurd. Further, and also contrary to the article's implication, *neither Kizer nor the Philharmonic ever even accused Wang of drugging* Kizer.

4.     Defendants *knew* that their story was false because two sets of documents that the article identifies as having been "reviewed" to prepare the article—police reports from Vail, Colorado and the arbitration decision—each make it clear that there was *no* evidence supporting the notion that Wang drugged Kizer—or that she was drugged by anyone.  By: (a) presenting Kizer's purported drugging as *fact*; (b) and as having been caused by Wang; and (c) implying that the Vail police reports or arbitration records support these contentions, Defendants deliberately misled readers in these three distinct and crucial ways.  The Vail police reports, and the evidence presented in the arbitration, *are inconsistent* with the article's implications that Kizer was drugged and that Wang drugged her—but the article, while *pretending* to rely on the police reports and arbitration decision, avoids mentioning everything in those documents that profoundly undermine its "Wang drugged Kizer" theme.   In another illustration of its bad faith, the article further attempts to tie Wang to this false accusation by suggesting that Kizer and/or

the Philharmonic had *accused* him of drugging Kizer—but neither ever did—not in connection with Wang's termination, the resulting 2019 arbitration, nor at any other time.

5.      The article, although false, caused Wang to instantly become a pariah.  Within days of its publication, nearly every position Wang occupies or relationship he has in the world of classical music—all built up over several decades—was severed.  Worst of all, although Wang has been a member of the Philharmonic since 2006, the publication of the false article resulted in his immediate suspension from performing or rehearsing with the Philharmonic—or even entering its building.[2]

6.      On April 30, 2024, 18 days after the article's publication, Sussman repeated the defamatory statements on a podcast.

7.      Wang brings this lawsuit to demand a total of one hundred million dollars ($100,000,000) in compensatory damages for the catastrophic harm to his reputation maliciously caused by Defendants, as well as punitive damages.

## THE PARTIES

8.      Plaintiff Liang Wang, the married father of two children, each under two years old, is a resident of New Jersey.  He is the first oboe of the New York Philharmonic and has been employed in that capacity since 2006.  He is widely recognized as one of the world's most accomplished classical musicians.  In the Philharmonic's words, Wang is a "premiere member of the orchestra" whose "musical contribution is critical to [the Philharmonic's] success".  Notwithstanding his recognition as a classical music performer, Mr. Wang is a private person

---

[2] Wang has also sued the Philharmonic for suspending him in violation of the collective bargaining agreement and for related claims.  *See Wang v. Philharmonic Symphony Society of New York, et al.*, Case 1:24-cv-03356, Doc. No. 1 (SDNY May 1, 2024).

and is neither a general nor limited purpose public figure as defined by the United States

Supreme Court in *Gertz v. Welch*, 418 U.S. 323 (1974).

9.    Defendant Sammy Sussman, the author of the defamatory article, is a resident of

New York.

10.    Defendant New York Media, LLC ("New York") is a Delaware Limited Liability

Company with headquarters in New York.  New York was acquired by Defendant Vox Media,

LLC in 2019.  At the time of the acquisition, New York owned New York Magazine and

Vulture.com.

11.    Defendant Vox Media, LLC, ("Vox") is a Delaware Limited Liability Company

with offices in New York City and Washington, D.C.  Vox's main New York office is at 85

Broad Street, New York, NY 10004.  Either directly or through New York Media, LLC, Vox

owns and controls New York Magazine and Vulture.com.  Vox regularly transacts business in

New York through its reporting operations in New York, including its operations relating to

acquiring and preparing the article for Vulture/New York Magazine.

## JURISDICTION AND VENUE

12.    This case is within this Court's jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

The matter in controversy in the cause of action exceeds $75,000.00 and the Plaintiff resides in a

different state than Defendants.  Venue is proper in this district under 28 U.S.C. §1391(b)(1) and

(2).

## FACTS

### In Vail, Colorado in 2010, Kizer Accuses Muckey of Sexual Assault

13.    In the summer of 2010, the New York Philharmonic performed concerts in Vail,

Colorado.  After an evening concert on July 24, approximately eight of the musicians—including

4

Muckey, Wang and Kizer—gathered for a small post-performance party.  It is undisputed that
Kizer drank alcoholic beverages at the party, but on the details, her recollection appeared to
differ from that of others.  Kizer would later insist that she drank "only" two glasses of wine and
nothing else.  But two others who attended told the Vail police that "everyone" present
[including Kizer] also drank margaritas, and a third person at the party remembered pouring a
margarita specifically at the request of Kizer—and remembered seeing her later holding the same
glass into which her margarita had been poured—but with the glass empty.  In total, as the
arbitration decision reflects, the evidence of "Kizer's alcohol consumption"—both on the night
of July 24 and at other times—is "mixed" and "more troubling" than what she self-reports.[3]

14.     After 12:30 am, Kizer left the party with Muckey and Wang and went with them
to the condominium they were sharing.  As she told the Vail police the following day, she had
"very little of the wine" that Muckey and Wang were also drinking, limited to "only a few sips"
or a "couple of sips."

15.     In the morning, Kizer, awoke to find herself still in the condominium, in bed with
Muckey.  Kizer later reported that she did not remember how she wound up in his bed.  When
Kizer realized that she and Muckey had engaged in sexual intercourse, she concluded that she

---

[3] The arbitration hearing testimony was confidential, and the arbitration decision, which discusses that
testimony, is therefore also considered a private document, to the extent that it necessarily discusses that
testimony in support of its findings.  Nevertheless, certain narrow aspects of the arbitration decision long
ago became the subject of public discussion, beginning with a public statement issued by then
Philharmonic President Debora Borda on April 5, 2020 about the result of the arbitration, which
*specifically quoted from the arbitration decision*.  More recently, Sussman claimed to have reviewed the
arbitration  decision (without revealing how he obtained it) and also quotes selectively (and misleadingly)
from the arbitration decision in the article.  Because portions of the arbitration decision that the article did
*not* quote refute the article's defamatory implications and are otherwise relevant to the fault burden of the
defamation claim, this Complaint quotes portions of the arbitration decision, but does not attach it: the
arbitration decision quotes and paraphrases the testimony of witnesses, to whom representations were
made that their testimony would remain private.  We are prepared to submit the arbitration decision to the
Court, in camera, at the Court's request.

must have been raped.  She also began to speculate that her lack of memory was caused by involuntary ingestion of a date rape drug—rather than the alcohol she consumed, the antidepressant medication she took, the high altitude of Vail, or some combination of those other reasons.  Kizer reported her suppositions to the Vail Police, which commenced an investigation.

16.     Wang had nothing whatsoever to do with the sexual encounter between Muckey and Kizer.  He slept in a separate room and did not see or hear sexual activity between Muckey and Kizer.

17.     After Kizer went to the Vail Police to report her suspicion that she had been raped by Muckey, the police conducted an investigation that included interviews with Muckey and Kizer.  The police also spoke with witnesses—Wang as well as various other Philharmonic musicians who had socialized with Kizer and Muckey during the preceding evening.  Because Kizer suspected that she had ingested a drug other than alcohol, the police caused laboratory tests to be conducted to attempt to detect various other drugs, but the tests were negative for the presence of each and every drug for which tests were run.  The District Attorney's Office, as the law enforcement agency with the power to decide whether or not to bring criminal charges against Muckey, declined to prosecute.  Kizer became aware that there was one "date rape" drug for which the police had apparently not tested—GHB.  She commenced her own efforts to detect that drug in her system through laboratory testing.  The article *falsely* portrays the results of that effort, i.e., that Kizer tested "positive for the presence of GHB" "around the month of the alleged assault."  In this respect, the article clearly suggests to readers that the result Kizer claimed to have received from one laboratory was indicative of the presence of GHB.  But that notion was dubious and far from scientifically reliable.  In Defendant Sussman's *own words*, given in a podcast interview 18 days after the article was published, the test result Kizer told him about was

not only inadmissible in court, but also "not at *all* indicative" of the presence of GHB.  But Sussman *withheld* those crucial facts from readers in the service of his preconceived, unsupportable and false narrative that Kizer was drugged.

18.     Years later, *the totality* of the forensic evidence bearing on whether there was any corroboration for Kizer's belief she ingested a date rape drug was comprehensively examined. The independent and widely respected arbitrator to whom *all* of the evidence was presented detailed how Kizer's "vigorous efforts to secure proof of drugs in [Kizer's] system" were "wholly unavailing."  But *in addition* to these unavailing tests, Kizer's own statement to the Vail Police reveals that GHB spiking of the wine she says she consumed at Muckey and Wang's condominium *did not* cause her self-reported symptoms.  First, Kizer admits that she drank *hardly any* of the glass of wine she says she was handed at the condominium, just "a couple of sips" according to the police report of what she said.  Second, Kizer told the police that she "felt weird almost immediately" and "*within one minute* she believed she went *unconscious*." However, GHB spiking could not have caused what she described as her "immediate" and "within one minute" self-reported symptoms.  Even *if* Kizer's wine glass had enough GHB to render her "unconscious," and even if she drank that glass of wine—rather than just a couple of sips—the minimum period between GHB ingestion and peak effect (i.e., unconsciousness in this hypothetical) is at a minimum 20 minutes, and ranges from 20-40 minutes.[4]

---

[4] *See, e.g., Busardo, Francesco P. and Alan W. Jones* "GHB Pharmacology and Toxicology: Acute Intoxication Concentrations in Blood and Urine in Forensic Cases and Treatment of the Withdrawal Syndrome," Current Neuropharmacology (2015 Jan. 13(1):47-70).  (Summarizing findings from multiple studies regarding timing of GHB effects as follows: "[t]he *onset* of GHB's effects on performance and behavior occurs 15-30 min after ingestion and lasts for up to 1-6 hours *depending on the dose*," and maximum blood concentration occurs within "20-40 minutes" of ingestion).

19.     Thus, Kizer's own statements to the Vail Police, as reflected in the police reports, together with the extensive laboratory tests that were conducted, reveal that contrary to Kizer's belief, she was not drugged by drinking a "couple of sips" of wine in Muckey's condominium.

20.     After the Colorado authorities declined to prosecute Muckey, Kizer attempted to have Muckey fired.  The Philharmonic, through its counsel, expressly stated at the time that it would not "inject itself" into the allegations made by Kizer given that "the police department has closed the investigation as the District Attorney did not find the level of evidence sufficient to file charges."

**In 2018, Muckey and Wang Were Terminated for Unrelated Reasons,**
**but Both Were Reinstated in 2020 After an Arbitrator Rejected the Terminations**

21.     In December 2017, the Philharmonic received a series of emails from "Jess Bennet" the name of a New York Times reporter.  The emails referred to the events involving Kizer and Muckey in Vail in 2010—and made no mention of Wang.  The emails were not from the New York Times reporter—when finally asked, Bennett confirmed that the Gmail email address from which the emails were sent was *not hers*.  It is not known whether Kizer sent or caused the sending of the fake "Jess Bennet" emails, but notably, the emails were about a dispute of eight years earlier between herself and Muckey in which the Philharmonic had previously declined to "inject" itself.

22.     The fake emails were a prime factor that, in 2018, motivated the Philharmonic to investigate what happened between Muckey and Kizer in Vail, in 2010.

23.     The Philharmonic hired former Judge Barbara Jones to conduct that investigation. After its conclusion, the Philharmonic fired Muckey, based primarily on Kizer's accusation.

24.     The Philharmonic also fired Wang—but did *not* accuse him of participating in any misconduct in Vail involving Kizer.  Instead, it based Wang's termination primarily on an

*unrelated* claim of purported misconduct years earlier than the 2010 Vail allegation against Muckey (and which *never* involved any law enforcement agency).

25.      The Union that represents the Philharmonic's musicians, Local 802 of the Associated Musicians of Greater New York, American Federation of Musicians (the "Union"), filed grievances, causing the terminations to be submitted to arbitration.  The distinct grievances were litigated in a single arbitration at the request of the Union and the Philharmonic—for reasons of perceived convenience.  Richard I. Bloch, Esq., jointly selected by the parties, presided over the resulting arbitration.

26.      The arbitration hearing lasted 20 days spread over the course of eight months, during which 15 witnesses were examined and cross examined, (some of whom were called to testify more than once) and approximately 144 enumerated exhibits were admitted—including all reports created by Judge Jones during her investigation.  Arbitrator Bloch also received post-hearing briefs from the parties totaling 199 pages.

27.      There were several significant differences between the arbitration and the Judge Jones investigation.  At the arbitration all of the witnesses were sworn, testified in person and both sides of the dispute had the opportunities to ask questions of each witness.  By contrast, during the investigation, none of the witnesses were sworn, only Barbara Jones (or others working for her) was able to ask questions, and certain crucial witnesses were interviewed only on the telephone.  The arbitration hearing thus had the hallmarks of due process that the investigation did not—a crucial distinction that Sussman deliberately withheld from readers (and podcast listeners) in the service of his preconceived and misleading narrative that the investigation was somehow more fair or reliable than the arbitration.

28.     On April 4, 2020, Arbitrator Bloch issued a 39-page Opinion and Award in which he explained in detail why, in light of the totality of evidence, the Philharmonic had failed to prove misconduct by Wang (or Muckey). The arbitrator noted that the Philharmonic's decision to terminate each of Wang and Muckey was based on "wholly independent events" with only Muckey's termination arising from Kizer's complaint to the Vail police in 2010. The arbitration decision also notes that Wang testified, discussing his testimony extensively. The decision applies a "clear and convincing" standard in considering the accusations against both musicians, explaining: "the employer must prove the charged offense: It seems unlikely that burden can be sustained with evidence that is either *un*clear or unconvincing." But as discussed in the portion of the decision discussing the drugging allegation, the evidence of misconduct did not even come close to being clear and convincing; "the evidence proffered by the Philharmonic falls *substantially* short of sustaining its burden." The Arbitration Award required that each of Muckey and Wang be reinstated, and in short order, they each rejoined the orchestra, regularly rehearsing and performing with the Philharmonic.

29.     Wang was thus again deeply involved in the world of classical music, performing for large audiences and teaching. He got married, had two children, and was treated with respect, as among the greatest oboists in the world. Beginning on May 8, 2024, Wang was slated to give a series of career defining performances at the Philharmonic—solos from a Mozart concerto considered the most important piece of music written for the oboe.

**Wang Is Contacted by "Sammy Sussman" Who Identifies Himself
as a Journalist and Asks Dubious and Misleading Questions
<u>About the Arbitration and the Drugging Allegation</u>**

30.     In late 2023, Wang received an email from Sussman, who said he was "an investigative reporter" working on a story in part about "allegations of sexual misconduct against you and on the New York Philharmonic's response." In the email, which mostly consisted of

statements and questions about the 2010 Kizer/Vail matter, Sussman referred to "Kizer's allegation against you [Wang]," claimed that he had "obtained" the arbitration decision and asked questions that included "did you testify before the arbitrator."

31.     In these ways, Sussman created troubling questions about his credibility and reliability, encompassing whether he really was a professional reporter.  First, an investigative reporter who had *actually read* the arbitration decision (as Sussman claimed) would not refer, as Sussman did, to "Kizer's allegation against *you* [Wang]" because *that arbitration decision reveals that Kizer's allegation was not against Wang*.  Second, an investigative reporter who had actually read the arbitration decision, as Sussman claimed, would *not* be asking Wang if he testified, as the fact that Wang *did* testify is extensively described in the arbitration decision (and was also reported by the New York Times).  Wang advised Sussman that he understood the arbitration to be confidential but provided Sussman with contact information for his counsel. Sussman thereafter forwarded the same set of dubious questions to Wang's counsel.

### Wang Reaches Out Directly to New York Magazine, Prior to Publication

32.     On April 10, 2024, after it became apparent that New York Magazine was about to publish the article *without itself communicating with Wang*, Wang's counsel reached out to New York Magazine.  In response, the associate counsel for New York Magazine's corporate owner, Vox, responded by letter dated April 11, stating that a member of New York Magazine's "editorial team" (Laura Thompson) would "duly consider[]" any statement on Wang's behalf. Thompson herself, in an email sent at 8:27 p.m., on April 11, subsequently presented Wang's

counsel with a pre-publication deadline of 11 am on April 12, to say what Wang wanted to say about the subject of the impending article.[5]

33.     Counsel for Wang then sent an email to New York Magazine, a copy of which is attached as Exhibit B. The email objected to the deadline New York Magazine had given for comment from Wang as unrealistic and pointed out that the narrative and set of questions that Sussman previously sent Wang (and which New York Magazine resent to his counsel) revealed that "New York Magazine is not currently able to publish an accurate article about Mr. Wang" given the "significant false assumptions" made by Sussman in his questions such as those that "assume, incorrectly, that Mr. Wang was accused of misconduct by Cara Kizer (or the New York Philharmonic in relation to Kizer."

34.     To further explain how in this instance, New York's Magazine's editorial process had not satisfied any reasonable journalistic standard, counsel for Wang also stated the following, *inter alia*, in a letter to New York Magazine's associate counsel, Elissa Cohen, on April 12 before publication:

> [G]iven the confidentiality of the arbitration process, to the extent that any individual accounts you received include partial information about the content of the arbitration hearing and record, the individual accounts are necessarily incomplete (and may come from persons who were willing to violate the confidentiality order of the arbitrator).  That is, no subset of individual accounts of what happened in the arbitration or about the facts it explored could be complete *without the arbitration testimony*.
>
> \*       \*       \*
>
> Your letter proclaims that the "information" in the Article will have been "vetted thoroughly" before publication, but NYM is in no position to actually do that vetting.  NYM *cannot* thoroughly vet accounts of or about individuals who testified in the arbitration, without the testimony that was actually given.

---

[5] New York Magazine purports to use a fact checking process before publication, but was on the cusp of publishing Sussman's article, *with no intention* of reaching out to Wang or his counsel before publication.

35.     New York Magazine's response was curt, and rested on a very general statement about the control journalists obviously exercise with respect to the content of their reporting.  As Associate General Counsel Cohen stated by letter dated April 12, "it is journalists who ultimately get to determine and weigh the relevance, importance and credibility of information they come upon and consider in their reporting."  A copy of that letter is attached as Exhibit C.

36.     But this truism did not explain away the undeniable conclusion that, based on the content of the email Sussman and New York Magazine had sent to Wang, New York Magazine was about to publish a story that would falsely portray Wang as having drugged Kizer (and falsely imply that he had been accused of such)—which is exactly what it then did.

37.     Notably, in its prepublication correspondence with Wang's counsel, New York Magazine did not represent that anyone *from New York Magazine* had examined any of the purportedly corroborative materials Sussman said he relied on for his article—the Vail Police reports and the arbitration decision.  This leaves only two possibilities: (1) either New York Magazine recklessly failed to perform this crucial aspect of the fact checking process, even after being told by Wang's counsel that Wang did *not* face any accusation about conduct involving Kizer and Vail in the arbitration (contrary to what the article had been drafted to report); or (2) New York magazine did review the Vail Police reports and arbitration decision, saw the evidence in those documents that refute the article, and then published the article anyway, knowing from the content of the Vail Police reports and the arbitration decision that the article's claims against Wang were false.

38.     In any event, the fact Sussman reached out to Wang to seek pre-publication comment does not alter the conclusion that Sussman's methodology was ultimately grounded in the service of his preconceived narrative.

**New York Magazine Publishes the Defamatory Article on Its "Vulture"**
**Online Platform, in Which Wang Is Falsely Accused of Drugging Cara Kizer**

39.     On April 12, 2024, New York Magazine published "A Hidden Sexual-Assault Scandal at the New York Philharmonic: two musicians were fired for sexual misconduct.  Why are they back with the orchestra?"

40.     The "sexual-assault scandal" as presented in the article is about the purported drugging and rape of Kizer, the only alleged sexual misconduct that the article purports to describe.  As Sussman would later say in a podcast interview, Kizer was the "main subject of my reporting."

41.     Visually, the article graphically plants the false impression with readers that Wang was a participant in the scandalous sexual misconduct referenced in the headline, even before reading the body of the article. The article does this with a photo of the Philharmonic in performance, marked up with red-lines linking Wang to Matthew Muckey (the other musician) and also to Cara Kizer (the purported victim), that is placed immediately adjacent to the headline's reference to the "Hidden Sexual-Assault Scandal at the New York Philharmonic" and to the sub-headline: "two musicians were fired for sexual misconduct."

42.     After visually conditioning readers to associate Wang with misconduct against Kizer, the article reinforces that deliberate misimpression with its words. Specifically, it strongly implies that Wang drugged Kizer so that Muckey could rape her, tying Wang to what purportedly happened to Kizer with the headline.   The "two musicians … fired for sexual misconduct" are a clear reference to Wang (and Muckey), as is the headline's question, that asks why "they" are "back" with the Philharmonic in the wake of a "sexual-assault scandal."

43.     The article reports that Kizer was drugged, as if that were a fact.  For example, it refers to Kizer's "exposure" to GHB and then reports, in quotations, that Kizer tested "positive for the presence of GHB" "around the month of the alleged assault."

44.     The article then strongly implies that Wang was the person who drugged Kizer. First, it attributes Kizer's drugging to a "glass of red wine" that Wang purportedly "brought her," describing Kizer as having "no memories" after she "drank from" it.  Second, the article uses a quotation from Kizer—"you don't ever think your *colleagues* are going to do something nefarious"—immediately after the statement that Kizer agreed to join Muckey "and Wang for a glass of wine," implying that a second colleague of Kizer's—Wang—was part of the "nefarious" conduct committed against Kizer.  Third, in successive paragraphs, the Article bemoans that Wang remains "active in the ensemble," quotes an orchestra member that she avoids "them" (including Wang) because she does "not feel safe," and following a reference to "the allegation of drugging" quotes an orchestra member as asking, "are women safe when we go on tour." Fourth, the article reinforces its story line that Wang is supposedly guilty of drugging Kizer by quoting unnamed persons for their gratuitous name-calling about Wang.  One person is quoted as calling Wang "sleazy."  Another, described as only a "male colleague," is described as having the opinion that Wang [and Muckey] was "capable of drugging someone to commit a crime." An average reader of the article would understand that Defendants inserted such gratuitous character assassination of Wang to reinforce the main story line as to Wang—that he purportedly drugged Kizer and got away with it.

45.     The article also reinforces its implication that Wang drugged Kizer by giving the false impression that Wang was accused of that by the Philharmonic when it fired him and at the resulting arbitration.  Indeed, the article weaves together Kizer's alleged drugging and rape with

the purported reasons for Wang's termination.  Reinforcing its false implication that the

Philharmonic made the Kizer allegation against Wang, the article points out that *other*

allegations were individually against Wang or Muckey—by for example referring to "unrelated

allegations . . . against Wang" and to an "earlier" allegation "against Muckey."  By contrast, the

article never refers to the Kizer allegation in this fashion, reinforcing its intent to falsely

communicate to readers that Kizer's allegation was made by the Philharmonic against *both*

Wang and Muckey.

46.     Reflecting that the article was understood by readers as reporting that Wang had

credibly been accused of Kizer's drugging by Kizer and the Philharmonic, a website ("the Violin

Channel") characterized the article's theme as: "outlining allegations of misconduct by  . . .

Liang Wang against former NY Philharmonic horn player, Cara Kizer, in 2010."  Further

evidencing that readers understood the article as accusing Wang of participation in the alleged

drugging and rape of Cara Kizer were the online comments posted on Vulture's site.  For

example, after reading Sussman's description of Kizer's allegations, commenters referred to

Wang and Muckey collectively as "rapists who drug their coworkers," "widely-known

predators," and "DateRapeDrugBros."

47.     The article, although *seeming* to ask in its headline why Wang is "back" after

being terminated, answers that question for readers by misleadingly and selectively describing

the arbitrator and arbitration decision so as to imply that the arbitrator wrongly ruled in Wang's

(and Muckey's) favor.  Liang is "back" because, in the article's telling, an arbitrator did not use

"common workplace evidentiary standards" when he cleared Wang of responsibility for Kizer's

drugging, and instead required clear and convincing proof of the accusations.  The article implies

the arbitration result was a function of applying that supposedly too rigorous standard.  But as

the arbitration decision points out, that standard (*less* than the standard of proof in criminal cases) is routinely used in labor arbitrations when the underlying conduct alleged is criminal, and in any event, the evidence *fell far short*. That is, "the employer must prove the charged offense: It seems unlikely that burden can be sustained with evidence that is either *un*clear or unconvincing." And as the decision elaborated, "the evidence proffered by the Philharmonic *falls substantially short* of sustaining its burden" with regard to Kizer's allegation. As further indication of the article's preconceived narrative, it tries to diminish the standing of the arbitrator by referring to him as "a part time professional magician." In fact, Richard I. Bloch is one of the most respected labor arbitrators in the nation. But by these and other selective and misleading remarks about the arbitrator and arbitration decision, the article suggests that none of the evidence introduced in the arbitration could *fairly* explain why Wang prevailed against what the article *portrays* as Kizer's allegation against Wang (which she didn't actually make) so as to make it "back" to the orchestra.

**Sussman and New York Magazine Knew that the Article's Defamatory Claims Were False Because the Defamatory Theme of the Article Is Refuted by the <u>Vail Police Reports and Arbitration Decision that Sussman Claimed to Have Reviewed</u>**

48.     The article states the reporter reviewed "200 pages of [law enforcement] documents" [and the arbitration decision] to imply that "what follows" in the article fairly reflects the content of those documents. But it does not.

49.     While the article portrays Kizer's purported drugging as an incontrovertible fact—such as by reporting that Kizer tested "positive for the presence of GHB" "around the month of the alleged assault"—the law enforcement records and the arbitration reveal instead that there was *no credible scientific basis* for the purely speculative notion that Kizer was drugged. But because this evidence did not square with the article's preconceived narrative, Sussman excluded any reference to that actual evidence and instead used references to his own

purported review of police records and the arbitration decision to deceive readers into thinking

that the article's conclusions were supported by those documents, when they were not.

50.     As the arbitration decision reveals, "vigorous efforts to secure proof of drugs in

[Kizer's] system" were "wholly unavailing" and an expert forensic toxicologist *engaged by the*

*Philharmonic* explained why she would not "testify[] for the presence of date-rape drugs" based

only on a "hair test alone."  A private laboratory chosen by Kizer herself, Toxicology Associates,

"informed the [Colorado] detective assigned to the matter" that a dubious second opinion Kizer

had obtained elsewhere "would not be of evidentiary value."  And "[t]hereafter, Ms. Kizer sent a

hair sample to the Carlson Company, but, according to her, the results were unintelligible."

51.     Sussman and his editors at New York Magazine *knew* these facts (from the police

records and arbitration decision) that *debunked* the notion of any credible scientific support for

the idea Kizer was "exposed" to GHB "around the month of the alleged assault"—yet excluded

these facts from the article in the service of its preconceived narrative.

### The Article, in Blaming Wang for Kizer's Purported Drugging, Deliberately Avoids Reporting Known Facts that Refute or Undermine that Claim

52.     The article clearly suggests that Kizer's drinking of the glass of wine that Wang

purportedly brought her is the only known explanation for her loss of consciousness.  It does this

by labeling as "undisputed" that Kizer had "no memories" after she "drank from that glass"

brought to her by Wang.  But the Vail police records tell a different story.

53.     First—known to Defendants but deliberately not revealed to readers of the

article—Kizer told the police that she drank "very little of the wine" she alleges Wang gave her,

perhaps only "a couple of sips."

54.     Second, while the article ties the glass of wine Wang purportedly brought to Kizer

to her loss of memory, Kizer told the police that she "did not see" who poured that glass of wine.

18

This is another fact, known to Sussman, that he deliberately withheld from readers, to cast Wang in the worst possible light.

55.     Third, Kizer's own statements to the Vail police, as revealed in the police records that Sussman obtained, all but preclude the possibility that Kizer's self-described experience of losing consciousness was caused by GHB or some other "date rape" drug in the glass of wine she says that Wang handed to her.  An investigative reporter not operating with a preconceived narrative and instead intent on *fairly reporting the facts*, would have attempted to discern *whether* what Kizer described to the police was, as she guessed, evidence of her being drugged— or instead evidence that she was not drugged.  Had Sussman undertaken any such research, he would have learned that what Kizer reported to the police (the miniscule amount of wine she drank in Muckey's condominium and that her unconsciousness occurred "within one minute" of a couple of sips) is strong evidence that what she drank at the condominium could not explain her loss of consciousness.  Although GHB has been described as having a "rapid" rate of absorption when taken orally, it does not cause nearly instantaneous unconsciousness; rather, studies have shown it is absorbed over 20-40 minutes.[6]  What Kizer described, one minute from two sips to unconsciousness, is not scientifically supportable—especially because of the tiny amount consumed.   There is only one reason why Sussman avoided learning and reporting this fact:  it was irreconcilable with the *Wang drugged Kizer with a glass of wine* preconceived narrative he was invested in reporting—the facts be damned.

56.     Fourth, the police records also reveal that Kizer told the police that she drank "two glasses of white wine" at the party that immediately preceded her visit to Muckey and Wang's condominium and that other persons said that she drank at least one margarita.  There is

---

[6] *See* FN4.

no evidence that Wang or Muckey had anything to do with the wine served at the party, which was being served by someone else, nor that, at the time, they knew Kizer would wind up back with them at their condominium.  Sussman, having reviewed the Vail police records, was aware of this, but he deliberately omitted it to prevent readers from having the information that would allow them to understand that, if Kizer's loss of memory was indeed caused by what she drank, that the better explanation for that was the wine and drinks served to her by others at the party (which she actually drank) and not the two *sips* she drank from the wine glass allegedly handed to her by Wang.

57.     The article also avoided reporting still more facts, revealed in the arbitration decision, which show Kizer's alleged loss of memory could have been caused by factors not attributable to the "couple of sips" of wine she drank from a glass of wine Wang purportedly brought to her.  For example, as the arbitration decision recites, not only did Kizer acknowledge drinking "two glasses of white wine" but also "taking antidepressant medication at the time."  Further, the Decision explains that the hearing "testimony concerning Kizer's alcohol consumption, on the other hand, is mixed and more troubling" [for Kizer].

58.     In sum, Sussman and New York Magazine, in the service of their preconceived narrative, included only dubious claims selectively manipulated to appear to support the notion of Wang drugging Kizer, while deliberately not reporting the actual facts that revealed strong reasons to doubt how the article portrays the drugging allegation.

### The Article Tries to Reinforce Its Drugging Allegation Against Wang by Falsely Portraying His Firing by the Philharmonic (and His Arbitration) as Based on that Allegation

59.     The article attempts to reinforce the allegation of drugging, as against Wang, by misleadingly implying that Kizer and the Philharmonic *accused* Wang of drugging her, when in actuality, neither did.  The arbitration decision that Sussman claimed to have reviewed is

abundantly clear that Wang faced no such accusation from either Kizer or the Philharmonic.  The decision notes that the Philharmonic's decisions to terminate Wang and Muckey were based on "wholly independent events" with only Muckey's termination arising from Kizer's complaint to the Vail police in 2010.  Reinforcing that "Kizer/Vail" was *not* a claim made *against Wang*, the arbitration decision correctly describes the issue in Wang's case as resulting from "a single uncorroborated claim *registered many years after the event*" involving someone who also admitted to occasionally "participating in consensual sex" with Wang.[7]  But although, in these and other passages, the arbitration decision makes it obvious that Wang was not accused in connection with Kizer/Vail, the article deliberately created the false contrary impression—that Wang had been accused by Kizer and the Philharmonic of drugging Kizer in 2010.

60.     The Philharmonic itself agrees that it did *not* accuse Wang of complicity in the alleged Kizer/Vail misconduct.  As the Philharmonic's lawyer expressly acknowledged in 2019: "We don't say that [Wang] engaged in misconduct in Vail."

61.     In point of fact, Kizer did not accuse Wang of drugging or doing anything else to her.  As she told Judge Jones when interviewed by her in 2018, Kizer "always thought Matt was the perpetrator and she wasn't trying to bring anyone else down."

---

[7] As to Wang, his termination and resulting arbitration principally concerned different events at a different time (several years before 2010).  The arbitrator's reasons for reinstating Wang were compelling, and in any event the Philharmonic could have challenged the arbitration decision in court, but chose not to do so.  Moreover, there is no basis to believe that anybody *has ever made a report to law enforcement accusing Wang* of a crime.  Mr. Wang is constrained from elaborating further because of the expectation of confidentiality given to those who testified in the arbitration proceedings.

**New York Magazine Refused to Correct the Article,**
**<u>Underscoring Its Bias and Malice</u>**

62.     On April 12, 2024, immediately after the article was published, Wang's counsel

wrote to New York Magazine to point out that it "blatantly defames Mr. Wang" by falsely tying

him to Kizer's alleged drugging.  Wang's counsel observed that:

> *Before* New York Magazine published the Article, I communicated to [New York
> Magazine] in no uncertain terms, that Ms. Kizer did *not* accuse Mr. Wang of *any*
> misconduct. New York Magazine ignored this crucial information, which is an
> undisputed fact, in its rush to publish a hit piece.

The letter from Wang's counsel went on to demand that New York Magazine revise the article to

"state clearly that the allegations made by Kizer were NOT against Mr. Wang."  The letter also

demanded that the gratuitous, anonymous comments about Wang (as "sleazy") and as someone

who was "capable of drugging someone to commit a crime" be removed from the article.  A

copy of the letter from Wang's counsel to New York Magazine is attached as Exhibit D.

63.     New York Magazine's associate general counsel responded by email (a copy of

which is attached as Exhibit E) grudgingly conceding that Wang's termination and reinstatement

"may have been" for a "different" reason than the Kizer accusation that was reported in the

article—but then, relying only on notion that according to Kizer "Wang handed her the drink,"

stated that New York Magazine's "editorial team" had "determined" that the magazine "will not

be updating or revising the article" to make corrections.  The response ignored Wang's request to

delete the article's gratuitous, anonymous comments.

64.     In refusing to revise the article, even after conceding that the article "may have"

described the drugging allegation as a basis for Wang's termination *when it was not*, New York

Magazine further revealed its malice and bias.  It relied for its refusal to revise on Wang's having

purportedly handed Kizer "the drink"—but whether or not Wang handed Kizer a drink, Wang

was simply not accused of spiking Kizer's drink, and the article had falsely suggested otherwise.

In any event, this was a disingenuous basis to stand by that aspect of the article, as New York Magazine knew at that time from the Vail police reports (and the arbitration decision) that there was no evidence that "the drink" contained anything other than wine, no corroborative evidence of Kizer's belief that she was drugged, and furthermore, that Kizer barely touched the wine she claimed to have received from Wang (but actually drank multiple other drinks provided by others that night).

**16 Days After the Article Is Published,**
**Sussman Defames Wang (Again) in a Podcast**

65.    On April 30, 2024, Sussman participated in a podcast, "the inline G flute podcast" to discuss his article with the host, Gareth Houston (the "Podcast").  Sussman repeated some of his defamatory accusations against Wang—and provided even more evidence that he was aware of the misleading nature of his own article.

66.    Building up to his accusation, Sussman, in referring to wine purportedly poured by Wang, says of Kizer, "she drinks *a glass of red wine* and remembers nothing" thereafter.  But Kizer did not drink "a glass" of red wine.  As reflected by the police reports that Sussman had himself obtained—Kizer said that "she had **very little** of the wine, probably a couple of sips."  But Sussman, by characterizing the couple of sips Kizer says she drank as instead "a glass" did so to provide false evidence for his thesis that the wine poured by Wang caused Kizer's sudden unconsciousness.

67.    Continuing to drag Wang into an accusation that he did not even face, when the interviewer asked Sussman to confirm that the Philharmonic "terminate[d] the employment of Matthew Muckey *and Liang Wang due to the allegations of what happened in 2010*" Sussman answered affirmatively—which he knew, as to Wang, was untrue.

68.     Further revealing that his purpose is to portray Wang (and Muckey) as guilty of sexual assault in spite of the Philharmonic's failure to prove that to the arbitrator during a 20-day hearing, Sussman falsely suggests to listeners that his article's conclusions are somehow *not inconsistent* with the arbitration decision. Specifically, Sussman tells listeners that the arbitration "decision does not comment on the underlying merit of the claims of the two men." That is absurd. The entire 39-page decision is all about the underlying merit of the claims against the two men, and it explains comprehensively why the claims fail—not for some procedural defect, but on their merits. As noted above, the decision explains why "the evidence proffered by the Philharmonic falls *substantially* short" of proving misconduct by either Wang or Muckey. The fact that the decision referenced the Philharmonic's "burden" simply reflects that when judges or arbitrators adjudicate the merits of an accusation, they must do so against the relevant burden of proof.

69.     Further revealing his effort to demean the arbitration decision without giving listeners a fair sense of what it actually says, Sussman describes the decision as resting on a finding that "it's hard for *the men* to prove that they understood no to mean no." But as to Wang, this is intentional distortion of what the arbitration was about, what the decision says, and it defames Wang. Wang's position in the arbitration regarding the explanation he was given for being terminated was *not* that he should be excused because he had failed to understand or accept that "no," when communicated by a sexual partner or potential partner, means no. Sussman misleads listeners in this fashion to persuade them to doubt the correctness of the arbitration decision—based on a characterization of the arbitration decision that Sussman knows to be false.

70.     Sussman also reveals that, by the time he reached out to Wang for comment, he had already decided on his story's false narrative. Indeed, Sussman's specialty as a reporter is to

report sexual assault or harassment by persons of prominence—he never reports that such an accusation of sexual misconduct was unfounded.  As Sussman explained in the Podcast, he did not reach out to Wang for comment until he was otherwise potentially ready "to move forward with the story."  But if Sussman, after working on his story for many months, was still intent on reporting falsely that Wang had been fired based on an accusation *from Kizer*—he was not going to be deterred by any statement Wang made in response to Sussman's questions.   Sussman gave Wang an opportunity to comment so that Sussman could mislead readers into thinking Sussman had an open mind in writing the story—when he did not.

71.     Continuing to misrepresent the facts, Sussman describes the Cara Kizer matter as "one of those rare cases where there's such substantive police evidence."  In this way, again, Sussman suggested to listeners that police evidence (which he does not describe) supports the theme of his article (that Muckey raped Kizer after Wang purportedly drugged her).  But despite Sussman's impassioned reference to "such substantive police evidence," as he knew, the police records actually reveal no evidence whatsoever of criminal conduct by Wang and instead undermine that notion.

72.     Finally, Sussman attempts to undermine the decision of the arbitrator by visibly laughing at arbitrator Bloch because he is an amateur magician in his spare time.  Then, Sussman incorrectly describes the clear and convincing standard Bloch applied as a "quasi-criminal standard."

### Plaintiff Has Suffered Severe Reputational Harm

73.     Prior to the publication of the article, Plaintiff had enjoyed a lengthy and successful career as one of the most highly regarded oboists in the world.

74.     The false allegations in the article have severely damaged Plaintiff's professional reputation.  Now, anyone looking Plaintiff up online is met by accusations that he drugged one of

his musician colleagues, Cara Kizer with a date rape drug.  This is there for any future employer to see, as well as for his family, friends, neighbors, and acquaintances.

75.     The false allegations in the article have caused severe emotional, psychological and physical distress to Plaintiff as he has seen his reputation unfairly tarred.

76.     The damage done to Wang's reputation by the publication of the defamatory article is impossible to understate.   On April 12, the Philharmonic's CEO emailed the members of the orchestra about the article, referring to it as "distressing."  The next day, April 13, Wang was indefinitely suspended from the orchestra.  And two days later, April 15, the Philharmonic's CEO sent out an email that referred to the article and to how Wang was now perceived in the orchestra because of the article, i.e., that it had "prompted a lot of strong feelings."  On April 18, the CEO sent an email to the entire New York Philharmonic Community, further emphasizing his own perspective, which was apparently also the perspective of many who read the article, that the Kizer accusation had been, as to Wang, "*revealed* in the *New York* magazine article."

77.     Wang has not only been suspended from performing and told to stay away from rehearsals, but has also been prohibited by the Philharmonic from so much as entering David Geffen Hall (where the Philharmonic performs and rehearses) (without pre-approval).[8]

78.     The devastating consequences for Wang generated by the article's false portrayal of him are compounding by the day.

79.     On April 15, 2024, the Taipei Music Academy and Festival informed Wang that it was being pressured to cancel Wang's participation in the festival—and did so.

---

[8] Wang has separately brought suit against the Philharmonic.  *See* FN2, *supra*.

80.     On April 17, 2024, the ARD International Music Competition notified Wang that it was suspending its collaboration with Wang, who was scheduled to serve on the jury for the 2024 competition.

81.     On April 19, 2024, the Manhattan School of Music publicly announced the suspension of Wang as a member of MSM's precollege faculty.

82.     On April 29, 2024, Wang was contacted by Marc Neikrug, the director of the Santa Fe Chamber Music Festival, and composer of the arrangement of the Mozart Oboe Concerto Wang had been scheduled to perform on May 8.  Neikrug was commissioned by the Philharmonic to write the piece expressly for Wang to perform.  However, in light of the Philharmonic's decision to suspend Wang and cancel the performance, Neikrug concluded that he had no choice but to find "another place for his piece."

83.     On April 30, 2024, the Chinese American Arts Council informed Wang that it was cancelling his contract as Artistic Director to the Council in connection with New York Chinese Film Festival, motivated in part by the article and the Philharmonic's related decision to publicly suspend Wang.

84.     On May 8, 2024, a representative of the Lyric Chamber Music Society informed Wang that he would be removed from Lyric's program for the upcoming concert season.

## FIRST CAUSE OF ACTION

### DEFAMATION
### (Against All Defendants Based on the Article)

85.     Plaintiff repeats and realleges paragraphs 1 – 84 above.

86.     Sussman wrote the false and defamatory article about Plaintiff with a knowing and reckless disregard for the truth and thereby caused and continues to cause Plaintiff damages.

87.     Vox published the false and defamatory article about Plaintiff with a knowing and reckless disregard for the truth and thereby caused and continues to cause Plaintiff damages.

88.     The statements in the article are false and defamatory *per se* because they tended to injure Plaintiff in his trade, business, or profession, and implicated him in conduct that, if committed, would constitute a serious crime.

89.     Defendants published the defamatory statements in the article knowing that they were not an accurate and fair report of statements made to the Vail police, with reckless disregard for the truth of the statements.

90.     Plaintiff has been severely damaged by Defendants' actions alleged above, which have had destructive effects on Plaintiff's personal and professional reputation, his emotional and psychological well-being, and his professional relationships and job opportunities, thereby entitling Plaintiff to an award of monetary damages.

91.     Defendants' conduct was committed knowingly, intentionally, willfully, wantonly, maliciously, recklessly, and irresponsibly, with the intent to harm Plaintiff, or in blatant disregard of the substantial likelihood of causing him harm, thereby entitling Plaintiff to an award of punitive damages.

### SECOND CAUSE OF ACTION

**DEFAMATION**
**(Against Sussman Based on Podcast Statements)**

92.     Plaintiff repeats and realleges paragraphs 1 – 91 above.

93.     On the April 30 Podcast, Sussman again defamed Wang by again falsely implying that Wang was guilty of drugging Cara Kizer in 2010.  The implication that Wang drugged Kizer is one of the themes of the Podcast, revealed by such statements as that Kizer "remember[ed] nothing" right after drinking "a glass of red wine" given to her by Wang.  But Kizer did not drink

"a glass" of wine given to her by Wang, and as Sussman likewise knew, there was no evidence Kizer was drugged by Wang, or anyone.

94.     On the Podcast, Sussman also defames Wang with a new false contention—saying that his defense in the arbitration was that he did not understand "no to mean no." But Wang has never said anything of the kind.

95.     Sussman knew that these accusation against Wang were false—from the Vail police reports and from the arbitration decision itself, but included them in the service of his preconceived narrative.

96.     Sussman made the Podcast statements about Plaintiff with a knowing and reckless disregard for the truth and thereby caused and continues to cause Plaintiff damages.

97.     The statements made by Sussman about Wang in the Podcast are false and defamatory *per se* because they tended to injure Plaintiff in his trade, business, or profession, and implicated him in conduct that, if committed, would constitute a serious crime.

98.     Sussman published the defamatory statements by expressing them in the Podcast, knowing that they were not an accurate and fair report of statements made to the Vail police or the arbitration decision, with reckless disregard for the truth of the statements.

99.     Plaintiff has been severely damaged by Susman's actions alleged above, which have had destructive effects on Plaintiff's personal and professional reputation, his emotional and psychological well-being, and his professional relationships and job opportunities, thereby entitling Plaintiff to an award of monetary damages.

100.    Sussman's conduct was committed knowingly, intentionally, willfully, wantonly, maliciously, recklessly, and irresponsibly, with the intent to harm Plaintiff, or in blatant

disregard of the substantial likelihood of causing him harm, thereby entitling Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff Liang Wang demands judgment against all Defendants, including:

a.   compensatory damages of ninety million dollars ($90,000,000) for the first cause of action (all Defendants), ten million dollars ($10,000,000) for the second cause of action (Sussman) together with interest and the costs and disbursements of this action, plus reasonable attorneys' fees;

b.   punitive damages, to be determined at trial; and

c.   such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: New York, New York
May 23, 2024

CARTER LEDYARD & MILBURN LLP

By:   _____/s/ Alan S. Lewis_____
Alan S. Lewis
Karen E. Meara
28 Liberty Street, 41st Floor
New York, NY 10005
lewis@clm.com
meara@clm.com
(917) 533-2524

*Attorneys for Plaintiff Liang Wang*