# EXHIBIT A

# A Hidden Sexual-Assault Scandal at the New York Philharmonic

**Two musicians were fired for sexual misconduct. Why are they back with the orchestra?**





This story was originally published on April 12, 2024. Following publication, the New York Philharmonic announced that Matthew Muckey and Liang Wang, the two musicians accused of misconduct, are no longer rehearsing or performing with the orchestra.

This article was featured in One Great Story, *New York*'s reading recommendation newsletter. Sign up here to get it nightly.

At 8 p.m. on July 24, 2010, the New York Philharmonic finished the second concert in their weeklong residency in Colorado for the Bravo! Vail Valley Music Festival. The concert, titled "German Masters," featured music by Mozart, Mendelssohn, Schubert, and Wagner. More than 100 musicians and staff from the orchestra had come to town for the performance.

According to police records about that night, after the concert, Ethan Bensdorf, a member of the orchestra's trumpet section, invited around ten of his colleagues to an apartment he had rented for the week. Among them was Cara Kizer, one of the newest members of the ensemble.

Tall and collected with neatly parted shoulder-length brown hair, Kizer had joined the orchestra earlier that year as assistant principal and utility horn. Her primary instrument was French horn, which she had started playing in junior high school in Lubbock, Texas, before studying at Juilliard in New York and the Curtis Institute of Music in Philadelphia. She was only the second woman to win a job in the Philharmonic's brass section in the organization's history.

At around ten o'clock that night, two of Kizer's colleagues, Liang Wang and Matthew Muckey, joined the gathering at Bensdorf's apartment. Muckey, the Philharmonic's associate principal trumpet, was in his mid-20s, having won a spot in the brass section straight out of college. Wang was a few years older and already one of the orchestra's highest-paid members; as principal oboe, he played the tuning note at the beginning of every concert. The two men had joined the Philharmonic at nearly the same time, in 2006, and were, in Muckey's words, best friends: They were late because they had been at dinner together with Muckey's parents, who were in town.

In later police interviews, colleagues described Muckey and Wang as immature. Muckey had been seen on tour with different women; one colleague described Wang as "sleazy." A female colleague described an incident from a tour to Barcelona the previous February in which the two men started a conversation about a female musician by saying that she was "playing great" and ended the conversation by saying that they would "really like to do her."

Kizer wasn't particularly close with either man, but that night, she sat next to Muckey on a couch at Bensdorf's apartment, her arm stretched along the back of the couch behind him. After she learned that her husband's expected 11:30 p.m. arrival to Vail would be delayed by a few hours, she agreed to join Muckey and Wang for a glass of wine at Muckey's condo.

"You don't ever think your colleagues are going to do something nefarious," Kizer told me. She texted her husband and told him she was going to stay out with friends. She added that her phone was running out of battery.

When they got to Muckey's condo, he and Wang got in the hot tub and tried to persuade Kizer to join them, but she declined. Kizer alleged that Wang brought her a glass of red wine. Wang later told the police that Kizer got her own wine.

What was not disputed is that Kizer has no memories of what happened after she drank from that glass. Cara Kizer. Photo: Sara Messinger

Neither Muckey nor Wang would speak to me for this story, and a spokesperson for the New York Philharmonic wrote in an email that he could not respond to questions about Kizer's time in the orchestra. The account that follows is based on interviews with Kizer, her friends and colleagues, and law-enforcement officials. I also reviewed more than 200 pages of documents from the Vail Police Department and Colorado's Fifth Judicial District Attorney's Office.

According to Kizer, she woke up the morning after the concert in Muckey's bed, naked. She felt groggy and sick and there were red vomit stains on the floor around the bed. She went into the bathroom and wrapped herself in a light-purple towel. She found her pants in a drawer with Muckey's pants and her shirt in the washing machine downstairs.

When she returned to the bedroom, Muckey was awake. He handed Kizer her underwear, saying that he found it in the bedsheets. As he drove her back to her hotel, Kizer asked Muckey what had happened the previous night. Kizer noticed that he wouldn't make eye contact with her.

"He wouldn't say anything," Kizer recalled, "except 'I have to go meet my dad.'"

When Kizer returned to her hotel, she found her husband sleeping with his cell phone beside him. He had texted her over and over during the previous evening.

Kizer decided to shower before waking him up. After she undressed, she realized that a tampon that she had put in the previous day had been pushed so far into her vagina she had trouble removing it. She told the police that at that moment, "my heart jumped up in my throat."

After her shower, Kizer told her husband about the glass of wine and how she woke up in Muckey's bed with no memory of the night before. In an interview, he told me she seemed like she was in shock.

They went together to the hotel lobby, where Kizer met Amanda Stewart, a trombonist for the orchestra.

"I still remember that scene," Stewart told me. "She was visibly shaking, just so upset."

After Kizer told her what happened, Stewart urged her to go to the police. Kizer's husband agreed. He went back to the hotel room and found the tampon in the garbage. He placed it in a coffee cup, hoping to turn it over to the police.

Kizer, however, didn't want to skip rehearsal that evening. At the amphitheater, she spoke with Carl Schiebler, the orchestra's personnel manager, who called in a doctor who was working at the festival. The doctor in turn called the Vail police, which sent an officer to pick Kizer up. She asked the patrol car to stop a few hundred feet down the road to be "away from everybody." The officer placed Kizer's French horn in the back of the vehicle, and they drove away.

At the station, Kizer spoke with a detective named Rusty Jacobs, a 20-year veteran of the department. He asked Kizer to summarize what had happened to her. After hearing her story, he asked if she would call Muckey from a phone at his desk. Jacobs called this a "controlled call": He would tape the call and offer occasional prompts to help Kizer elicit information.

Muckey spent most of the phone call saying that he couldn't remember what happened between them. But he was able to recall details from the night like putting Kizer's clothes in the washing machine and the conversations they had. His statements were inconsistent: When questioned about his actions the previous day, he said he "felt fine" when he woke up; he quickly clarified that he had a "terrible hangover." Later, he would tell Jacobs that he and Kizer had indeed had sex but it was consensual.

"I had just found this tampon shoved so far up inside me that I could not reach it," Kizer said. "That would have been the most painful, uncomfortable experience ever. No consenting woman would do that."

Late that night, Kizer went to a local hospital, where she was given a sexual-assault exam and tested for date-rape drugs. Two days later, on June 27, a nurse collected a DNA sample from Muckey.

Jacobs spoke with six Philharmonic musicians and staff about Kizer, Muckey, and Wang. Several spoke highly of Kizer's credibility but raised questions about Muckey and Wang, with one male colleague stating that Muckey and Wang "think everything in the world is theirs for the taking." Jacobs asked whether they would be capable of drugging someone to commit a crime. "Yes," the man replied, "I could see that." By the time the residency ended, though, no charges had been filed and Muckey and Wang left town with the rest of the orchestra.

Before she left Colorado, Kizer obtained an order of protection from a judge preventing Muckey from interacting with her. At concerts and rehearsals, however, she still had to play alongside him. At night, when she had trouble sleeping, she would spend hours listening to a recording of the controlled call.

In September, Kizer and her husband attended a get-together with a few other members of the orchestra. Kizer later told Jacobs that during the gathering, Bensdorf let them know about an allegation of rape against Muckey brought by a former Philharmonic musician a few years earlier.

Kizer was shocked that she was only hearing about this accusation now. "There were all these stories floating around," she said. "Yet no one warned us."

The New York Philharmonic wields an enormous influence on the cultural life of the city. Founded in 1842, it is the oldest orchestra in the country, famous in previous decades for the nationally televised broadcasts of Leonard Bernstein's concerts for young children and, through to the present day, for its commitment to commissioning new works.

The organization has long struggled with gender diversity. Though the Philharmonic is now evenly split between men and women, these changes in the orchestra's makeup are recent, and female musicians still make up only a quarter of the orchestra's coveted principal positions. The orchestra's

brass section has been particularly slow to modernize. Kizer was the second woman hired for the section; the first, Amanda Stewart, had arrived six months before her. When the orchestra's outgoing music director, Jaap van Zweden, is replaced by Gustavo Dudamel in 2026, he will join an unbroken line of male music directors.

Within this hierarchical and unequal framework, Kizer occupied a particularly vulnerable position in the fall of 2010. As a new hire, her job was probationary. Like all musicians, she would have to be granted tenure by a committee made up of her colleagues. The process was long, involving nearly two years of deliberations before a final vote. (Muckey had originally been part of Kizer's tenure committee, but he was removed after the orchestra returned from Vail.)

Stewart faced her own tenure hearing, in February 2011. She told me that in September 2010, Schiebler, the personnel director, told her that the orchestra's music director was "so happy with her playing and so happy she was there."

But within a month, Stewart said, members of the brass section had begun criticizing her support for Kizer.

"How dare a probationary, non-tenured member accuse a tenured member of anything," Stewart claimed a musician in the brass section told her. At one point during the orchestra's fall tour in Europe, Stewart took a photo of Muckey moving close to Kizer. Stewart said Alan Baer, the orchestra's tuba player, saw her take the photo and pulled her aside a few days later.

"'If you don't stop supporting her publicly, this is going to harm your tenure,'" Stewart said that Baer warned her. (Three people confirmed that Stewart told them about this conversation at the time. Baer denies he said this to Stewart.)

Around Thanksgiving 2010, an "emergency meeting" was called by members of Stewart's tenure committee. Though Stewart was traveling, Schiebler called to tell her that "things do not look good" because there were "major concerns" about her playing.

On February 11, Alan Gilbert, the orchestra's then–music director and conductor, told Stewart that she didn't "lay it down enough." She would not be receiving tenure. Stewart says that a member of the tenure committee told her that the vote had gone against her eight to one. She believed that taking the photo in Europe "was the nail in my coffin."

Kizer declined to speak to me about her own tenure process, which played out in the spring of 2012; four people familiar with the matter say that she signed an NDA before accepting a six-figure settlement and leaving the orchestra. Stewart told me she believed that Kizer's tenure bid, like hers, had been derailed by the accusations she made against Muckey.

In Vail, Jacobs got the results of the tests he had ordered, and there was a match: Muckey's DNA was found on Kizer's tampon. There was no evidence, however, that Kizer had been drugged. Wang denied that he had given Kizer anything, and Muckey continued to insist that the sex was consensual. Jacobs worried that his investigation had reached a dead end.

Kizer began researching date-rape drugs. The ten-panel test she'd taken in Colorado didn't include a test for GHB, which produced symptoms similar to those she'd experienced the night of July 24, so Kizer sent a sample of her hair to a private lab. On February 9, 2011, she got the results. A six-centimeter hair sample was "positive for the presence of GHB." Later testing suggested the exposure occurred around the month of the alleged assault.

"For me, it was like, 'Oh my God, this is it,'" Kizer said. She was more convinced than ever that she had been drugged.

Jacobs sent the case file to the Fifth Judicial District Attorney's Office with a memo recommending that charges be filed, but the DA declined to prosecute Muckey. Jacobs was told that the hair-follicle test "did not meet the standards for litigation." (One forensic toxicologist called the practice of testing for date-rape drugs in hair follicles "controversial.")

"I finally have this information, and now all these other people are screwing it up," Kizer said. "It felt like I was meeting such resistance, like this system didn't care that a crime happened to me, to my body." Kizer added that whether or not she'd been given GHB, her clear incapacitation — she was blacked out and moments away from vomiting — left her unable to consent to sex.

Jacobs eventually arranged for a meeting between Kizer and Deputy District Attorney Joe Kirwan, who told her he didn't think his office had enough evidence to proceed. Kizer said that Kirwan wouldn't make eye contact. "He was looking down, fiddling with a paperclip," Kizer said. "He just looked so disinterested."

John Clune, an attorney who specializes in sexual-abuse cases and a former employee of the Fifth Judicial District Attorney's Office, said he didn't understand why the DA didn't prosecute. (Clune wasn't involved with Kizer's case.)

"It looks very predatory, when you have a woman who, by all accounts, is a very straightlaced, happily married woman and suddenly she's incredibly intoxicated to the point where she's puking and passing out in their condo when there are seemingly sober individuals," Clune said.

With no new action from the police or DA's office, the Philharmonic seemed to treat the issue as resolved. Muckey and Wang remained in the orchestra; Kizer and Stewart both ended up leaving New York altogether.

In early 2018, a few months after reporting about Harvey Weinstein's pattern of predation ignited the Me Too movement, the Philharmonic returned to the allegations Kizer made against Muckey. The organization hired Barbara S. Jones, a former federal judge, to conduct an independent investigation. In addition to Kizer's claims, the orchestra learned about the earlier rape allegation against Muckey and unrelated allegations of sexual misconduct against Wang. (Muckey and Wang denied the allegations.)

Over a six-month, $336,573 investigation, Jones interviewed 22 individuals and reviewed "extensive documentary evidence." The Philharmonic concluded that the two men had "engaged in misconduct warranting their termination."

Muckey and Wang were fired in September 2018. Nearly all the details of the investigation were withheld from the public. A New York *Times* article on the subject was headlined "New York Philharmonic Dismisses 2 Players for Unspecified Misconduct."

Muckey and Wang continued to deny they were guilty of misconduct and appealed to their union, Local 802 of the American Federation of Musicians, to challenge their firings. The union agreed. A spokesperson for Local 802 defended the decision. "The alleged conduct took place over 8 years prior and much of the evidence appeared to be based on hearsay," the spokesperson said. "Accordingly, Local 802 decided that two dues-paying members had the right to have a neutral arbitrator hear and decide the merits of their discharge cases."

The independent arbitration was presided over by Richard I. Bloch, a high-profile attorney, arbitrator, and part-time professional magician. The Philharmonic declined to comment on the arbitration, citing a confidentiality agreement, but I reviewed the arbitration opinion and spoke with people familiar with the proceedings. Kizer testified, as did other alleged victims. Kizer says Muckey attended her testimony, but he declined to speak at the hearing, citing his right against self-incrimination. The

Philharmonic defended the dismissals, asking that Bloch draw the "strongest possible adverse inference" from his refusal to testify and "conclude that Muckey engaged in the serious misconduct."

According to the Philharmonic, Jones's investigation had operated under common workplace evidentiary standards, which would mean that she looked for a "preponderance of evidence" that the men were guilty. Bloch's review used a higher bar, that of "clear and convincing" evidence.

In April 2020, Bloch ruled in favor of Muckey and Wang, citing the fact that the "events at issue occurred some 8, 10 and 12 years prior" and the "potential degradation of corroborative evidence over time." Because "sex acts are normally performed privately," he wrote, "the task of demonstrating assault charges, including those resulting from the refusal to take 'no' for an answer, can be difficult to prove."

The Philharmonic released a statement that it was "profoundly disappointed" by the decision. Shortly afterward, Muckey and Wang were reinstated to their positions.

This past January, the New York Philharmonic celebrated the 100th anniversary of its "Young People's Concerts" series. A two-minute clip from the most recent performance in this series, of Mussorgsky's "Pictures at an Exhibition," featured Muckey playing the piece's famous trumpet part.

Muckey shared the video on his Facebook page, writing that "it was so fun to play lead on Pictures" and it was "an iconic excerpt all trumpet players grow up practicing."

In response to a detailed list of fact-checking questions, a lawyer for Muckey sent *New York* Magazine this statement: "These allegations, made over a decade ago, were thoroughly investigated by the appropriate authorities and no charges were filed. After a full, extensive arbitration hearing, the independent arbitrator found that the allegations were unsubstantiated and Mr. Muckey was justifiably reinstated with back pay."

A lawyer for Wang stressed that Bloch is "one of the most highly respected labor arbitrators" and the hearing he conducted "finally allowed all of the facts to be fully examined, and after the hearing, Arbitrator Bloch concluded that the Philharmonic had simply failed to prove any misconduct" by Wang.

Both the Philharmonic and Local 802 have recently taken steps to reform their grievance processes. The two organizations reached a new collective-bargaining agreement in 2020 forcing a "preponderance of evidence" standard in all future arbitrations. In a statement, the Philharmonic stressed that it takes allegations of workplace misconduct seriously and has "policies and protocols in place to prevent and address any instances of discrimination, harassment, and retaliation."

Interviews with current and former musicians and orchestra staff, however, reveal that some employees, particularly female employees, continue to feel unsafe. A current member of the orchestra told me about an incident this past February in which her male colleagues spoke negatively about Asian women performing with the orchestra. "They were saying that their playing lacked musicality and that it was a 'cultural' thing," she said. There was "no apparent awareness or concern that it might not be appropriate."

Erik Ralske, a former Philharmonic musician and the current principal horn of the Metropolitan Opera Orchestra, wrote in an email the orchestra was an unusually difficult place to work. "I've been a full-time member of seven different orchestras and a guest at a number of others (Cleveland, Philly, LA, Dallas, Berlin Staatskapelle). Sure I've seen squabbles, tantrums, and disagreements between musicians, but never, ever anything close to the heinous conduct of a handful of former NYP colleagues," Ralske said. "The effect of the repeated outrageous behavior of those people was one of callousness on the part of the orchestra at large, who probably feared retribution if they spoke out."

When he takes over, Gustavo Dudamel will have a lot of work to do to repair the Philharmonic's culture. But even his best efforts likely won't change the reality that Muckey and Wang remain active in the ensemble. One musician who used to play frequently with the orchestra said that she stopped once the two men were reinstated.

"It's the fact that the arbitration went that way and it was swept under a rug, never to be spoken about again," she said. "I do not feel safe so I avoid them at all costs."

One tenured female member of the orchestra agreed that the silence about what happened in Vail is particularly disturbing. "The fact that we can't talk about it, we can't ask about it, means that we can't ask the question: What if it happens again?" she said. Given the allegation of drugging, "are women safe when we go on tour?"

It's now been more than a decade since Kizer and Stewart left the Philharmonic. Both played with orchestras around the country; Kizer spent several years with the Seattle Symphony. In 2014, she and her husband divorced, and a few years later she settled in St. Louis. She and Stewart had stayed in touch over the years, and eventually they started dating. In 2018, they bought a house together.

Today, Kizer teaches French horn and still takes orchestra jobs; Stewart teaches trombone and performs with the St. Louis Symphony. Auditions for assistant principal and utility horn at the Philharmonic — Kizer's former job — were held last month. The post has been vacant for years.

*Initial reporting for this story was funded by the Investigative Reporting Workshop.*