UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------

LIANG WANG,

                Plaintiff,

      v.

SAMMY SUSSMAN, VOX MEDIA, LLC., AND
NEW YORK MEDIA, LLC,

                Defendants.

-------------------------------------------------------------------------

Civil Action No. 1:24-cv-03987-AS


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS COMPLAINT</u>**


CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, NY 10005
(917) 544-2524
lewis@clm.com
meara@clm.com

*Attorneys for Plaintiff Liang Wang*


*Of Counsel,*

    Alan S. Lewis
    Karen E. Meara

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES ............................................................................................. ii

ARGUMENT ................................................................................................................... 1

I.    THE ARTICLE FACIALLY DEFAMES WANG BECAUSE ITS FALSE
ALLEGATIONS SUGGEST THE INFERENCE THAT HE DRUGGED
KIZER, AND IN ANY EVENT, THE ARTICLE IMPARTS AND INTENDS
OR ENDORSES THAT INFERENCE ..................................................................... 1

    A.    The Article and Podcast Are Facially Defamatory .......................................... 1

    B.    Although Wang Disputes the Applicability of the Defamation by Implication
Standard, He Easily Satisfies It .................................................................... 3

II.    THE FAIR REPORT PRIVELEGE DOES NOT IMMUNIZE DEFENDANTS'
IMPLICATION THAT WANG DRUGGED KIZER ............................................... 9

    A.    The Challenged Defamatory Implication Is Ineligible for Immunity Under
Section 74 Because It Was Not Attributed to or a Part of the Police
Investigation .............................................................................................. 10

    B.    The Defamatory Innuendo Is Not Privileged Because It Is Not a Fair and
Accurate Report of the Police Investigation ................................................. 13

    C.    The Article Is Not Protected as Opinion Grounded in Fully Disclosed
Facts ......................................................................................................... 15

III.    WANG PLAUSIBLY PLEADS ACTUAL MALICE ........................................... 16

CONCLUSION .............................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airlie Found., Inc. v. Evening Star Newspaper Co.*,
    337 F. Supp. 421 (D.D.C. 1972) ........................................................................19

*Alf v. Buffalo News, Inc.*,
    21 N.Y.3d 988 (2013) ........................................................................................13

*Armstrong v. Simon & Schuster*,
    85 N.Y.2d 373 (1995) .......................................................................................1, 3

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) ..................................................... 18, 19, 20

*Brimelow v. New York Times* Co.,
    2021 WL 4901969 (2d Cir. Oct. 21, 2021) ........................................................19

*Celle v. Filipinio Reporter Enters.*,
    209 F.3d 163 (2d Cir. 2000) ......................................................................... 3, 4, 20

*Chalpin v. Amordian Press*,
    128 A.D.2d 81 (1st Dep't 1987) .........................................................................15

*Church of Scientology Int'l v. Behar*,
    238 F.3d 168 (2d Cir. 2001) ...............................................................................18

*Curtis Publ'g Co v. Butts*,
    388 U.S. 130 (1975)) ..........................................................................................19

*Daniel Goldreyer, Ltd. v. Van de Wetering*,
    217 A.D. 2d 434 (1st Dep't 1995) ......................................................................13

*Fine v. ESPN, Inc.*,
    11 F. Supp. 3d 209 (N.D.N.Y. 2014) ........................................................... 12, 13

*Greenberg v. Spitzer*,
    155 A.D.3d 27 (2d Dep't 2017) ..........................................................................12

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ..................................................................................... 18, 20

*Hogan v. Herald*,
    84 A.D.2d 470 (4th Dep't 1982), aff'd, 58 N.Y.2d 630 (1982) .................... 10, 11

*Hunt v. Liberty Lobby*,
    720 F.2d 631 (11th Cir. 1983) ...........................................................................20

*Karedes v. Ackerley Group*,
    423 F.3d 107 (2d Cir. 2005) ........................................................................... 13, 14, 15

*Kesner v. Dow Jones & Co. Inc.*,
    515 F. Supp. 3d. 149 (S.D.N.Y. 2021) ................................................................ *passim*

*Lacher v. Engel*,
    33 A.D.3d 10 (1st Dep't 2006) ................................................................................... 13

*Martin v. Daily News L.P.*,
    121 A.D.3d 90 (1st Dep't 2014) ............................................................................ 9, 15

*Martin v. Hearst Corp.*,
    777 F.3d 546 (2d Cir. 2015) ....................................................................................... 3

*Masson v. New York Magazine*,
    501 U.S. 496 (1991) .................................................................................................... 3

*McDonald v. East Hampton Star*,
    10 A.D.3d 639 (2d Dep't 2004) ................................................................................ 15

*Ocean State Seafood v. Capital Newspaper*,
    112 A.D.2d 662 (3d Dep't 1985) .............................................................................. 13

*Palin v. N.Y. Times*,
    2024 WL 3957617 (2d Cir. Aug. 28, 2024) ............................................................. 18

*Partridge v. State of New York*,
    173 A.D.3d 86 (3d Dep't 2019) .............................................................................. 4, 7

*Prins v. International Tel. and Tel. Corp.*,
    757 F. Supp. (D.D.C. 1992) ...................................................................................... 11

*Ramos v. E. Diario Publ'g Co.*,
    16 A.D.2d 915 (1st Dep't 1962) ............................................................................... 12

*Silsdorf v. Levine*,
    59 N.Y.2d 8 (1983) ........................................................................................ 4, 15, 16

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) ............................................................................................... 15

*Stepanov v. Dow Jones & Co., Inc.*,
    120 A.D.3d 28 (1st Dep't 2014) ......................................................................... 3, 5, 8

*Tannerite Sports, LLC v. NBC Universal News Group*,
    864 F.3d 236 (2d Cir. 2017) ....................................................................................... 2

*Vandenburg v. Newsweek, Inc.,*
    441 F.2d 378 (5th Cir. 1971)........................................................................................................20

*Watson v. NY Doe 1,*
    439 F.3d 152 (S.D.N.Y. 2020) .......................................................................................................6

*White v. Fraternal Order of Police,*
    909 F.2d 512 (D.C. Cir. 1990) ...................................................................................................4, 5

**Statutes**

N.Y. Civil Rights Law § 74 ..........................................................................................................9, 11

**Other Authorities**

43A N.Y. Jur. 2d Defamation and Privacy § 155 ...........................................................................12

Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*, § 7.3.5
    (5th ed. 2017) ...............................................................................................................................10

Liang Wang is one of the world's most highly acclaimed classical musicians and, since 2006, the principal oboe of the New York Philharmonic. On April 12, 2024, Defendants savaged Wang's reputation by publishing an article falsely suggesting that 14 years ago, Wang put a date rape drug into wine he served to another musician, Cara Kizer. On April 30, 2024, during a podcast, Sussman again suggested that Wang had drugged Kizer. To recover damages for the resulting harm to his reputation, Wang brought this defamation lawsuit.

Contrary to the arguments advanced by Defendants, the article *does* suggest that Wang drugged Kizer, the fair report privilege does *not* immunize Defendants, and the Complaint plausibly alleges Defendants' actual malice.

## ARGUMENT

I.    **THE ARTICLE FACIALLY DEFAMES WANG BECAUSE ITS FALSE ALLEGATIONS SUGGEST THE INFERENCE THAT HE DRUGGED KIZER, AND IN ANY EVENT, THE ARTICLE IMPARTS AND INTENDS OR ENDORSES THAT INFERENCE**

Defendants ground their motion to dismiss in their characterization of Wang's Complaint as resting only on a theory of defamation by implication. But defamation by implication is premised on "false suggestions, impressions and implications arising from *otherwise truthful statements*." *Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380-381 (1995) (emphasis added). Here, the article's suggestion that Wang drugged Kizer is based on a variety of factual statements, *some of which are false*. But even if the standard applicable to a claim of defamation by implication *from truthful statements* applied, the motion still fails because Defendants intended or endorsed the article's defamatory suggestion.

### A.    The Article and Podcast Are Facially Defamatory

The article and podcast express the notion that Wang drugged Kizer by falsely suggesting that: (1) Kizer drank a significant amount of the glass of suspect wine purportedly handed to her by Wang; (2) Kizer's allegations of drugging were purportedly corroborated by lab testing and police evidence; and (3) Wang was purportedly fired for drugging Kizer.

The article conveys the first of those falsities by statements such as that, according to Kizer, "Wang brought her *a glass* of red wine," that it was purportedly "not disputed" that "Kizer has no memories … after she drank *from that glass*," and that Kizer "told her husband about the *glass of wine*," (Bolger Decl. (ECF##26, 27) Ex. 1 ("article") at 2) and in the podcast, Sussman conveys it by claiming Kizer alleged Wang "poured her the glass of wine" and stating  Kizer "*drinks a glass of red wine* and remembers nothing."  Bolger Decl. Ex. 2, 3 ("Podcast") at 23:15, 9:13; *see also id.* 8:56; 9:07. These repeated suggestions that Kizer drank *a glass* of suspect wine handed to her by Wang were not accurate in light of the facts (hidden from readers and listeners, but known to Defendants) that Kizer told police she drank only a "couple of sips" of that wine and that she "did not see" who poured the wine.  Complaint (ECF#1) ("Compl.") ¶¶ 53, 54, 66; Bolger Decl. Ex. 4 ("PR") at 9.

The article and podcast convey the second of those false suggestions by stating that Kizer tested "positive for the presence of GHB" "around the month of the alleged assault" and that her purported drugging in Vail was corroborated by "substantive police evidence" (Compl. ¶¶ 17, 49, 71).  Podcast, 36:55.  Those factual assertions were false and misleading in light of the evidence not revealed to readers but known to Defendants, including that "vigorous efforts to secure proof of drugs in [Kizer's] system" were "wholly unavailing" (Compl. ¶ 50) and ████████████████████ ████████████████████████████████████████████████████████████████

The article and podcast convey the third of those falsities—that Wang was fired for drugging Kizer—via a combination of the article's headline, photo, and dozens of references to Wang as part of Sussman's reporting on Kizer's allegations (Compl. ¶¶ 40-45, 67-68) (*see also infra* at I.B).  But as the arbitration decision reveals, and Defendants knew, this was not true.[1]

---

[1] Defendants protest that this fact is substantially true.  Defendants' Memo of Law, ECF##24, 25 ("MOL") at 14-15.  That contention stretches the truth beyond recognition.  The question is whether the "pleaded truth" would "have a different effect on the mind of a reader." *Tannerite Sports, LLC v. NBC Universal News Group*, 864 F.3d 236, 242 (2d Cir. 2017). Wang pled that he was not fired for drugging Kizer, Compl. ¶ 3, and Defendants admit as much.  Thus the pled truth would have a "different effect" on readers.  To the extent Defendants argue that the actual cause of Wang's firing would have the same effect, that is pure speculation.

The innuendo that Wang drugged Kizer is thus a function of the reporting of false facts, and therefore Defendants' characterization of Wang's claim as based on implication from *truthful facts* must be rejected for the same reasons cited by the New York Court of Appeals for rejecting that argument in *Armstrong*, 85 N.Y.2d at 381: "this is not, as [defendants] argue, a case of 'a modern Rosetta stone' where the passage in issue must be 'stretched and extrapolated' by subjective interpretations in order to find any possible falsity. Rather, this is … a case of allegedly false statements of verifiable fact, with inferences flowing from those facts."

**B.    Although Wang Disputes the Applicability of the Defamation by Implication Standard, He Easily Satisfies It**

Even if the defamation by implication standard applied, Defendants' motion must be denied. The standard for whether a publication has implied a defamatory meaning focuses not on subjective intent of the publisher, but instead, on the objective standard of whether the offending publication "*can* be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov v. Dow Jones & Co., Inc.*, 120 A.D.3d 28, 37-38 (1st Dep't 2014) (emphasis added). Moreover, where a statement is "'susceptible of multiple meanings'" some of which are defamatory and some are not, "the court may not conclude, as a matter of law, that the statements are or are not defamatory." *Kesner v. Dow Jones & Co. Inc.*, 515 F. Supp. 3d 149, 170 (S.D.N.Y. 2021) (quoting *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 183 (2d Cir. 2000)). Defamation by implication can be established even where "all of the individual statements are literally true … in isolation," if by "omitting or strategically juxtaposing key facts," a communication imparts a false and defamatory inference. *Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015).

---

The accusation Wang faced was from a different person at a different time, with very different facts, including a conceded long-term cordial (and occasionally intimate) relationship between Wang and that other person post-dating the contested events, Compl. ¶¶ 24, 59, hardly comparable to a case in which the complainant immediately went to the police and later secured an order of protection. Cf. *Masson v. New York Magazine*, 501 U.S. 496 (1991). (describing substantial truth doctrine as intended to insulate publishers from libel over "minor inaccuracies").

Whether an article can be reasonably read to indicate that an author intended or endorsed an implied defamatory meaning is, like the implication itself, a function of the *entire* article, not just individual words or phrases that in isolation could be selectively marshalled to argue against a defamatory meaning. *See Silsdorf v. Levine*, 59 N.Y.2d 8, 13 (1983) ("[t]he entire publication, as well as the circumstances of its issuance, must be considered in terms of its effect upon the ordinary reader"). Thus, "this objective inquiry" "must examine" the challenged publication for "additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference." *Partridge v. State of New York*, 173 A.D.3d 86, 94 (3d Dep't 2019). *See also White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (The "intended or endorsed" requirement is met where "the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference.").

As explained in Paragraphs 40 to 47 of the Complaint, a reasonable reader most certainly *could* (and likely would) read the article to imply, from its mix of true and false statements, that Wang drugged Kizer and that Defendants intended or endorsed this implication. Defendants cherry pick the article to *argue* that it could *also* be interpreted differently, but fail to overcome the conclusion that *one* highly plausible way for readers to understand the article is that it imparts (and intends or endorses) the notion that Wang drugged Kizer—which is all that is required for Defendants' argument to fail. *Celle*, 209 F.3d at 163.

As the Complaint observes, and contrary to Defendants' contentions, (MOL at 1, 7), the article is inarguably *about Wang* (not just Muckey), starting with its headline: "A Hidden Sexual Assault Scandal at the New York Philharmonic. Two musicians were fired for misconduct. Why are they back with the orchestra?" Considered "in the context of the entire article," *see Kesner*, 515 F. Supp. 3d at 176, a reasonable reader would quickly conclude that the "two musicians" refers to Wang (and Muckey), and the "Scandal" (not scandals, plural) refers to the purported drugging and rape of Kizer, "the only alleged sexual misconduct that the article purports to describe." Compl. ¶

4

40. The photo immediately above the headline (the caption of which identifies Wang by name) graphically links Wang together with Muckey and Kizer via red circles, "plant[ing] the false impression with readers that Wang was a participant" in sexual misconduct directed against Kizer, Compl. ¶ 41. The text of the article reinforces this false impression by referring to Wang *dozens of times* by name and in other ways (*e.g.*, "the two men"). While a handful are innocuous (e.g., "they [Muckey and Wang] were late ..."), many are clearly designed to place Wang, in the mind of readers, at the center of the Kizer incident. For example, Sussman repeatedly refers to Wang in the same breath as Muckey in connection with the Vail criminal investigation: "By the time the [Vail 2010] residency ended, though, no charges had been filed and Muckey *and Wang* left town with the rest of the orchestra." (emphasis added); "With no new action from the police or the DA's office" after Kizer submitted purported evidence of drugging, "the Philharmonic seemed to treat the issue as resolved. Muckey *and Wang* remained in the orchestra." Article at 5, 8 (emphasis added). However, as Sussman well knew and the publishers knew or should have known, Wang was never named a "suspect" by the Vail police. PR at 12, 19, 29-31, 34-38, 42-57.

Each of these editorial choices—including Wang in the headline, circling him in the photo, and linking him over and over to the Vail police investigation, (and misrepresenting key underlying facts, *see supra* at I.A)—not only created the false implication that Wang committed misconduct against Kizer (and was fired for it), but also that Defendants intended that meaning. *Stepanov*, 120 A.D.3d at 36 (*quoting White*, 909 F.2d at 520, "the particular manner or language in which the true facts are conveyed, supplies ... evidence" of intention or endorsement).

The podcast similarly refers repeatedly to Wang in ways that inevitably tie him in listener's minds to misconduct against Kizer, starting with Sussman's introduction labeling Wang one of "the two people" that are the subjects of his reporting about Kizer's 2010 allegations. Podcast 6:47; 7:02. *See also* 11:57; 30:48; 33:05.

Underscoring the false implication, the article specifically "implies that *Wang was the person who drugged Kizer*" (emphasis added) by: (a) "attribut[ing] Kizer's drugging to a 'glass of red wine' that Wang purportedly 'brought her,'" (b) quoting Kizer as saying—"'you don't ever think your *colleagues* are going to do something nefarious'—immediately after the statement that Kizer agreed to join Muckey 'and Wang for a glass of wine'"; (c) "bemoan[ing] that Wang remains 'active in the ensemble,'" (d) quoting an anonymous orchestra member as stating "that she avoids 'them' (including Wang) because she does 'not feel safe,'" and another "as asking, 'are women safe when we go on tour' given 'the allegations of drugging'"; and (e) "reinforc[ing]" the false narrative Wang drugged Kizer "by quoting unnamed persons for their gratuitous name-calling about Wang" including an unnamed "male colleague," as agreeing that *Wang* [and Muckey] was "capable of drugging someone to commit a crime." Compl. ¶ 44 (quoting Article at 2, 3, 5, 10). *See also* Podcast 11:57 (repeating gratuitous insults and portraying the handful of comments from a non-representative sample of three orchestra members as "a pretty clear indication" of Wang's reputation). Thus, "[a]n average reader of the article would understand that Defendants inserted such gratuitous character assassination of Wang to reinforce the main story line as to Wang—that he purportedly drugged Kizer and got away with it," Compl. ¶ 44, indicating not only implication but also intent or endorsement. *See Watson v. NY Doe 1*, 439 F.3d 152 (S.D.N.Y. 2020).

The article reinforces its attempt to connect Wang to Kizer's purported drugging by conveying to readers, falsely, that the Philharmonic accused Wang of such conduct as a reason for its decision to terminate him in 2018. As the Complaint, paragraph 45, explains, while the article clearly refers to unrelated allegations as being individually against Wang or Muckey, the article "never refers to the Kizer allegation in this fashion, reinforcing its intent to falsely communicate to readers that Kizer's allegation was made by the Philharmonic against *both* Wang and Muckey."

Defendants claim the article "explicitly disavow[ed]" the notion that the Philharmonic accused Wang of, and fired him for, drugging Kizer. MOL at 2. But that misstates what the article

actually says (as Defendants later admit).  The article states (2,500 words into a 3,600-word article) that "[*i*]*n addition to* Kizer's claims, the orchestra learned about the earlier rape allegation against Muckey and unrelated allegations of sexual misconduct against Wang."  Article at 8 (emphasis added).  By this point, no reasonable reader would interpret this single mention of "unrelated allegations" after "*in addition to* Kizer's claims" to erase the article's narrative that Wang drugged Kizer and was fired for it.  At best, this statement tells the reader there were also unrelated grounds for Wang's termination.  It falls far short of disavowing the false implication.  Even if the inference urged by Defendants were plausible (and it is not), the issue cannot be resolved on the pleadings. *See, e.g., Kesner*, 515 F. Supp. 3d at 170 ("court may not conclude, as a matter of law, that the statements are or are not defamatory" if "susceptible to multiple meanings").  The podcast's purported disavowal similarly fails, conveying at best, additional allegations in the context of the broader conversation.  Podcast 22:54-23:15.

The false suggestion that Wang *was accused* by the Philharmonic of drugging Kizer is part of the way in which Defendants create an innuendo of Wang's complicity in such conduct.  *See, e.g., Partridge*, 173 A.D.3d at 92, 94 (rejecting defendant's argument that it "did not wrongly imply that claimant was a sexual predator" by falsely implying that he had been *arrested* for such conduct because "a reasonable viewer" could understand Defendant's publication of claimant's arrest photo to falsely suggest that he had "engaged" in the crime of which he was purportedly accused).

Finally, the article's framing of the arbitration as having applied a too strict standard, and strong suggestion that otherwise the "two musicians" would not be "back" with the orchestra, also communicates that Defendants intended or endorsed the implication that Wang had drugged Kizer, been fired for it, and gotten away with it.  *See also* Article at 10 (suggesting that "the reality that Muckey and Wang remain active" in the orchestra is a reality that requires "repair").

That readers *could* understand the article to impart the implication that Wang drugged Kizer is not merely theoretical: Wang pleads specific examples of readers who have expressly articulated

their understanding of the article as communicating exactly that. *See* Compl. ¶ 46 (e.g., referencing the Violin Channel's characterization of the Article as "outlining allegations of misconduct by … Liang Wang against former NY Philharmonic horn player, Cara Kizer, in 2010."); Lewis Decl. Exhibit A. *See also* NY Times "Philharmonic Sidelines 2 Players it Tried to Fire for Misconduct" (describing Wang as "sidelined" due to fallout from an article about Kizer's allegations).

Thus, from beginning to end, by choices made concerning language, framing and content, the article "as a whole" conveys the false impression that Liang Wang drugged Cara Kizer and ultimately got away with it, and that they intended or endorsed that impression. *Stepanov*, 120 A.D.3d at 37-38. And Sussman reconfirmed those false impressions in the podcast.

In service of their contention that the article purportedly does not endorse the implication of Kizer's drugging, Defendants argue that it reported there was "no evidence … that Kizer had been drugged." But again, when read as a whole, the article does indeed (though falsely) suggest not only that Kizer had been drugged but also that purportedly reliable forensic evidence supported this conclusion. The "no evidence" language is merely about the results of "the tests [Detective Jacobs] had ordered" in 2010. After reporting the failure of *the police* to secure evidence of drugging, the article misleadingly reports that Kizer herself subsequently secured purportedly corroborating evidence: "A six-centimeter hair sample was 'positive for the presence of GHB.' Later testing suggested the exposure occurred around the month of the alleged assault." Article at 7. Defendants chose *not* to report that this purportedly corroborative test result had been thoroughly vetted by experts, and its reliability rejected by an independent arbitrator. For example, "[a]s the arbitration decision reveals … an expert forensic toxicologist *engaged by the Philharmonic* explained why she would not 'testify[] for the presence of date-rape drugs' based only on a 'hair test alone'." Compl. ¶ 50. *See also* I.A, I.B above.

Finally, Defendants argue that "the headline … is nonactionable" and a "fair index" of the article's content, latching onto the article's one isolated mention of "unrelated allegations."

However, in the first instance, Wang does not argue, as Defendants suggest, that the headline is independently actionable. Rather, he argues it contributes, "in the context of the entire article" including its photo and text, to the article's highly defamatory inferences and facially false statements. *See, e.g, Martin v. Daily News L.P.*, 121 A.D.3d 90, 99 (1st Dep't 2014) ("court must consider … news item together with the headline … that introduces it"); *Kesner*, 515 F. Supp. 3d at 176 (even if not "independently actionable" headline "must … be evaluated in the context of the entire article"). As discussed at length above, the headline, in the context of the rest of the Article, helps to create and reinforce the misleading suggestions that Wang drugged Kizer, had previously been fired by the Philharmonic for it, and Defendants intended readers to draw that false inference.

## II.     THE FAIR REPORT PRIVELEGE DOES NOT IMMUNIZE DEFENDANTS' IMPLICATION THAT WANG DRUGGED KIZER

Section 74 of New York Civil Rights Law reads as follows:

§ 74. Privileges in action for libel. A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published. This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof.

Section 74 thus grants immunity to the publisher of a libelous statement *only if*: (a) the statement was "a part" of and attributed by the report to an official proceeding; and (b) the report describes the proceeding fairly and accurately. Here, Defendants satisfy neither condition. Instead, the Article fails to attribute Defendants' defamatory innuendo to the police investigation (of which that libelous innuendo was not a "part"). Also fatal to the invocation of Section 74, the Article is a fundamentally inaccurate description of the police investigation insofar as it concerned the notions that Kizer had been drugged, that Wang was responsible, and that Wang was purportedly fired on that basis.

A.     **The Challenged Defamatory Implication Is Ineligible for Immunity Under Section 74 Because It Was Not Attributed to or a Part of the Police Investigation**

In the offending article, Defendants implied that in 2010 (in Vail, Colorado) Wang drugged Kizer, and that in 2018, he was fired by the New Philharmonic on that basis.  While the article includes references to the Vail Police investigation, its innuendo that Wang drugged Kizer (and suggestion that he was fired for such) are *not attributed to the police file*, about which the article reports no statements expressing the judgment of the police that Kizer was drugged—much less that Wang drugged her (or that he would be fired eight years later on that basis).  Thus, while the article states that its author "reviewed" law enforcement records created during the 2010/2011 investigation, it does *not* attribute its ultimate defamatory implication/conclusion to those records, instead stating that the article is "*based on*" Sussman's recent—i.e., more than a decade after the police investigation closed—"interviews with Kizer, her friends and colleagues" and with "law-enforcement officials." Article at 3.  In short, the defamatory statements challenged in this lawsuit (the defamatory innuendo/suggestions) were not made previously by others to the police as part of the 2010 investigation, but instead by Defendants, in the challenged 2024 article, in the first instance (and repeated by Sussman in the podcast).

As New York's courts have explained, the fair report privilege is an exception to New York's republication doctrine, under which, a person who republishes a defamatory statement made first by another can himself also be liable for the defamatory publication.  As explained in *Hogan v. Herald*, 84 A.D.2d 470, 477-478 (4th Dep't 1982), aff'd, 58 N.Y.2d 630 (1982):  "Of course, one who repeats a libel is normally responsible even though the republication consists only of a quotation … There is a notable exception to this rule, however, known as the rule of fair report."

Thus, and as Judge Sack explains, "[a]s a general matter, *in order to enjoy the protection of the privilege*, the publication in issue *must clearly attribute* the [defamatory] statement in question to the *official proceeding or document* on which it is reporting or from which it is quoting."  Robert D. Sack,

*Sack on Defamation: Libel, Slander, and Related Problems*, § 7.3.5, at 7-25 (5th ed. 2017) (emphasis

supplied).  *See also Prins v. International Tel. and Tel. Corp.*, 757 F. Supp. 87, 93 (D.D.C. 1992) (holding

that the fair report privilege "applies only if the report properly *attributes the allegedly defamatory*

*statement to the official government record or proceeding*").  Relatedly, Section 74 expressly prohibits the

exercise of the privilege by the publisher of "a libel" "not a part" of the proceeding.

      But in this case, Defendants *have not* attributed the defamatory innuendo or implication that

Wang drugged Kizer to the Vail police, or to any witness interviewed by them.  Defendants *cannot*

for the obvious reason that the police received no accusations accusing Wang of drugging Kizer, and

no public body ever accused Wang of such.  That is, the article's defamatory meaning for which

Wang has sued Defendants is, to apply Section 74's second sentence, "not a part" of any official

proceeding.  Even in Defendants' own expression, their article about Wang is "based on" recent

(non-police) interviews with "Kizer, her friends and colleagues" as well as Defendants' own recent

*post-police investigation* interviews with "law-enforcement officials."

      The conclusion that Defendants' defamatory implications are not protected by Section 74 is

reinforced by the "principal theory" upon which Section 74 is grounded, that:  "the publisher acts as

the agent of the public, reporting only that which others could hear for themselves *were they to attend*

*the proceedings*."  *Hogan*, 84 A.D.2d at 477-478.  But here, a person who "attended" the police

investigation, i.e., by reading the police files, would not "hear for themselves" anything like the

innuendo expressed by an article which is in turn based on recent interviews, demonstrably

inaccurate characterizations of the police file, *see* I.A and II.B, and on the false suggestion that Wang

was fired for misconduct against Kizer.  While *the article* suggests that Wang drugged Kizer, neither

the Vail Police nor Colorado prosecutors reached any such conclusion, never having charged Wang

with such conduct, or even having named him as a suspect.

      Importantly, the article covers not only the Vail Police investigation, but later events,

including tenure determinations at the Philharmonic, the 2018 private investigation, the 2019

arbitration hearing, and Wang's reinstatement in 2020, and is replete with Sussman's own characterization of related events. *See, e.g., supra* at I.A, I.B (discussing how he falsely communicates that Wang was accused of and fired by the Philharmonic for misconduct against Kizer). The fair report privilege is "abused" "where the publisher draws conclusions or adds comments or insinuations of his or her own which are defamatory of the character of the plaintiff." 43A N.Y. Jur. 2d Defamation and Privacy § 155. *See also Fine v. ESPN, Inc.*, 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014) ("a report's mere mention of an official proceeding does not automatically extend the privilege to an entire publication; the privilege may apply to some portions of a report and not others.")

Even when the article purports to report on subjects examined by the police, it is not always clear whether the source of the article's conclusions—e.g., "Jacobs worried his investigation had reached a dead end"—is the police report itself or recent, often second-hand, recollections from Kizer or others. *Ramos v. E. Diario Publ'g Co.*, 16 A.D.2d 915, 916 (1st Dep't 1962) (holding fair report privilege inapplicable where "the allegedly libelous matter is not on its face confined to describing and characterizing actions occurring during any judicial or official proceeding"). For example, many of the characterizations about the interactions between the Vail Police and the DA's office, including that Jacobs sent a memo recommending prosecution [of Muckey] in 2011 (suggesting he found evidence of drugging compelling), are not reflected in the text of the police report. *See, e.g.*, Article at 7 (stating that "Jacobs sent the case file to the [DA's office] … recommending that charges be filed" after Kizer received results on February 9, 2011"); ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Because, to a substantial extent, the article's sourcing of the defamatory meaning in the police reports (as opposed to the article's other claimed sources) is often unclear, that lack of clarity itself deprives the article of Section 74's protection. *See, e.g., Greenberg v. Spitzer*, 155 A.D.3d 27, 43 (2d Dep't 2017) ("[i]f the context in which the statements are made make it impossible for the ordinary viewer [listener or

reader] to determine whether defendant was reporting on a judicial proceeding, the absolute

privilege does not apply").  Likewise, the fact that the article's defamatory meaning that Wang

drugged Kizer arises in large part from Kizer's present day statements ("you don't ever think your

colleagues are going to do something nefarious") (Article at 3) and Defendant's editorial choices

discussed at Section I above, the article's defamatory suggestion that Wang drugged Kizer is not

entitled to Section 74's protection.  *Fine*, 11 F. Supp. 3d at 216.

### B.     The Defamatory Innuendo Is Not Privileged Because It Is Not a Fair and Accurate Report of the Police Investigation

The fair report privilege only applies where a report is "substantially accurate."  *Alf v. Buffalo

News, Inc.*, 21 N.Y.3d 988, 990 (2013); *Karedes v. Ackerley Group*, Inc., 423 F.3d 107, 119 (2d Cir.

2005).  If the report "suggests more serious conduct than that actually suggested in the official

proceeding, then the privilege does not attach, as a matter of law'" *Daniel Goldreyer, Ltd. v. Van de

Wetering*, 217 A.D.2d 434, 435-436 (1st Dep't 1995).  *See also Ocean State Seafood v. Capital Newspaper*,

112 A.D. 2d 662, 666 (3d Dep't 1985); *Karedes.*, 423 F.3d at 119 (no dismissal based on privilege

where report "suggest[s] more serious conduct than that actually suggested in the official

proceeding").  Applying these principles, the article's implication that Wang drugged Kizer is not a

"substantially accurate" characterization of the police investigation.

The article is not like those that "essentially summarize or restate the allegations of a

pleading filed in an action [which] are the type of statements that fall within section 74's privilege."

*Lacher v. Engel*, 33 A.D.3d 10 (1st Dep't 2006).  Sussman took the police reports and cherry-picked

one page (*see* MOL at 10-11) to manufacture support for his Wang-drugged-Kizer innuendo and

withheld from readers content from the reports that undermine that idea.

First, the article never discloses that ██████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████  That omission alone defeats the

"substantially accurate" requirement, given the article's repeated implication that Wang was a participant in Kizer's drugging and a focus of the Vail police investigation. *See supra* at I.B. The fact that the police never deemed Wang a suspect would have caused "a different effect on the mind of the recipient" than the effect created by the article in its omission of that significant detail. *Karedes*, 423 F.3d at 107.

Second, the article attributes Kizer's drugging to a suspect "*glass of* red wine" that Wang purportedly "brought her" (and poured, according to the podcast), while never mentioning that Kizer told the police she drank only a "couple of sips" and "did not see" who poured it. *See* Compl. ¶¶ 14, 53, 54. By omitting these crucial facts and others (*see, e.g.*, Compl. ¶¶ 55-57) from a description of the police reports, the article causes a different impact on the mind of readers than the reports themselves, thus foreclosing Section 74 immunity.

Third, the article omits content that speaks to the credibility of the key players in Sussman's narrative and the reliability of colleagues' statements about each other. Although Sussman chose to quote Kizer as being concerned that "there were all these stories floating around" that "no one warned" her about, he failed to mention that the police report reflects that at least two of these "stories" that Kizer subsequently shared with the Vail police were conclusively debunked as false rumors. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ And regarding the "character" statements Sussman purportedly lifted from the police reports that disparage Wang, the statements are rephrased, selectively quoted or just plain wrong in ways that reinforced the negative connotations about Wang: (i) Sussman wrote "colleagues described Muckey and Wang as immature" but nowhere in the police report is *Wang* described as immature, Article at 2; PR at 23, 26, 34; (ii) Sussman wrote that a "female colleague" told police that she overheard "the two men talking about a female musician by saying that she was 'playing great' and ended the conversation by saying that *they* would 'really like to do her,'" Article at 2 (emphasis

added) (*see also* Podcast 11:57), but the police report states ███████████████

████████████████████████████████████████████████████████████████████

███████████████ (iii) Sussman fails to mention that the source of the "sleazy" quote also

admitted he "does not know [Wang] personally." *Id.* at 35. Finally, Sussman also omitted the

statement of a woman who described Wang as "mellow" and having a "mature attitude." Id. at 36.

*McDonald v. East Hampton Star*, 10 A.D.3d 639 (2d Dep't 2004), (MOL at 12), lends

Defendants no aid; *McDonald* involved a short news story on the outcome of a court case that

omitted a procedural fact (that plaintiff was granted leave to amend), not a substantive fact from an

investigation that would alter a reader's perceptions about the plaintiff in comparison to how a "true

and fair" report would be understood. Because the article portrays Wang in a worse light than does

the underlying police file, any implication arising from it is not entitled to protection. *Karedes*, 423

F.3d at 119. In sum, due to Defendants' selective and misleading portrayal of the police reports, the

fair report privilege cannot be invoked. *See Martin*, 121 A.D.3d at 100-01.

## C.    The Article Is Not Protected as Opinion Grounded in Fully Disclosed Facts

Defendants also argue the article's defamatory implication is entitled to protection as an

opinion based on "fully disclosed facts" that are "privileged by § 74." MOL at 12. But Defendants

misapply the law. First, "although expressions of opinion are constitutionally protected, accusations

of criminal or illegal activity, even in the form of opinion, are not." *Silsdorf*, 59 N.Y.2d at 16.

Defendants' tortious statements accusing Wang of the crime of drugging Cara Kizer, even if

opinions, are not protected under New York law.

Second, while *pure opinions* based on fully and accurately disclosed facts, *Steinhilber v. Alphonse*,

68 N.Y.2d 283, 289 (1986), are beyond the reach of defamation law, here, and as detailed at length

above, the "disclosed facts" are "either falsely misrepresented or grossly distorted" and therefore

"not exempt from defamation law as pure opinion". *Chalpin v. Amordian Press*, 128 A.D.2d 81, 85

(1st Dep't 1987) ("there is no constitutional value in false statements of fact").

Third, "statements of opinion that 'impl[y] a basis in facts which are not disclosed to the reader or listener' may be actionable 'because a reasonable listener or reader would infer that the speaker or writer knows certain facts, unknown to the audience, which support the opinion and are detrimental to the person toward whom the communication is directed.'" *Kesner*, 515 F. Supp. 3d at 171 (internal citation omitted). Sussman anchors much of his reporting on allusions to undisclosed facts, including the "more than 200 pages of documents from the Vail Police" and "Colorado's Fifth Judicial District Attorney's Office" that he claims to have "reviewed" and the "arbitration opinion." Article at 9. In so doing he clearly asks readers to infer that those documents "support" his repeated suggestion that Wang should not be "back." But as discussed above, Sussman repeatedly failed to disclose facts—like the fact that Wang was not fired for misconduct against Kizer—that would undermine the article's false implication that Wang drugged Kizer. Thus, Defendants are not entitled to the "pure opinion" protection. *Silsdorf*, 59 N.Y.2d at 14-16.

## III.    **WANG PLAUSIBLY PLEADS ACTUAL MALICE**

Wang's 30-page Complaint details the facts that are the basis for alleging Defendants' actual malice.[2] In 35 individual paragraphs (2, 3, 4, 13, 17, 27, 31, 33, 34, 37, 38, 47-59 and 62-72), the Complaint explains how Defendants misled readers about Wang. As the Complaint further explains, *prior* to publishing, Defendants had access to specific factual information (contained in the arbitration decision and police reports) that refutes the article's themes that Kizer was drugged, that Wang was the person who drugged her, and that Wang was fired on that basis. But as the Complaint also details, Defendants *concealed* and misrepresented that information in the service of a preconceived narrative.

---

[2] Wang disputes that he is required to plead actual malice. He is neither a general nor limited purpose public figure, and New York's anti-SLAPP statute cannot be the basis for imposing an actual malice burden: the statute is unenforceable in federal court because it contains procedures that are incompatible with the federal rules of civil procedure and its few substantive provisions are intended to be applied only together with its procedures. But given the number of issues raised and page limitations, it is impractical to brief these issues here. And as explained, even assuming Wang is required to plead actual malice, he has done so.

Unable to grapple with what the Complaint says, Defendants mischaracterize it as "not plead[ing] deliberate falsification." MOL at 17. But it surely does. *See, e.g.*, Compl. ¶ 4 ("Defendants *knew* that their story was false because two sets of documents that the article identifies as having been "reviewed" to prepare the article—police reports from Vail, Colorado and the arbitration decision—each make it clear that there was *no* evidence supporting the notion that Wang drugged Kizer—or that she was drugged by anyone."). *See also id.* ("In another illustration of its bad faith, the article further attempts to tie Wang to this false accusation by suggesting that Kizer and/or the Philharmonic had *accused* him of drugging Kizer—but neither ever did—not in connection with Wang's termination, the … arbitration" or otherwise).

The first way in which Defendants deliberately falsified the facts was by portraying Kizer's purported ingestion of the date-rape drug "GHB" as having been corroborated by laboratory testing—a portrayal Defendants knew to be misleading given their awareness of how the arbitration decision debunked that notion. *See supra* at I.A,B. Arb. Dec. at 18.

Second, Defendants distorted the police evidence concerning any connection between Wang and what allegedly happened to Kizer. The article does this by distorting the amount of wine that Kizer said she drank *from the glass purportedly handed to her by Wang*. As Wang pleads and the police reports show, "Kizer told the police she drank 'very little of the wine' she alleges Wang gave her, perhaps only '*a couple of sips*.'" Compl. ¶ 53. PR at 8. Yet a reader/listener would not know this from the article or podcast, which suggest Kizer consumed far more. *See supra* at I.A. Although Sussman admits he read the police file, he chose to mislead his readers/listeners into believing that Kizer drank much more than just two sips, in order to make it appear more likely than it actually was that the glass handed to her by Wang could have caused her loss of consciousness. Relatedly, in the podcast, Sussman also repeats that Kizer reported Wang poured the wine, (*see, e.g.*, 9:07 (Kizer "says that she saw [Wang] pour her the wine.")), whereas the police report indicates Kizer "told police that she 'did not see' who poured that glass of wine." Compl. ¶ 54. These intentional distortions

deliberately mislead readers into drawing an unwarranted connection between Kizer's self-diagnosed symptoms and the "glass" of wine allegedly handed by Wang to her, permitting an inference of actual malice. *See, e.g., Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989).

Third, Defendants also acted with actual malice by creating the impression Kizer's accusation was a reason for Wang's firing, a clear falsification. Defendants knew (based on the material they admit was in their possession) that Wang had never been accused—by the police, by Kizer or by the Philharmonic—of misconduct against Kizer. Compl. ¶¶ 42, 45, 46, 59-61.

Underscoring Defendants' awareness of facts that made the article's content knowingly false is that before publication, Wang's counsel sent a letter and emails warning them that, based on how Sussman had been describing his forthcoming article, Defendants were on the verge of publishing a piece with "many inaccuracies" including a *false* portrayal of Wang as having been accused of misconduct involving Kizer in Vail. *See* Compl. ¶¶ 32-37, Ex. B. Wang pointed out that the arbitration decision *disproved* the notion that Wang was even accused of misconduct against Kizer. Compl. ¶ 31. *See, e.g., Palin v. N.Y. Times,* 2024 WL 3957617 at 25 (2d Cir. Aug. 28, 2024) (holding that defendants' pre-publication receipt of information inconsistent with the theme of the subsequently published editorial permitted an inference of actual malice). Defendants published the article anyway, but Defendants' pre-publication possession of information incompatible with the article reveals that Defendants were either aware of the article's false assertions, or consciously avoided learning this by not reviewing the arbitration decision. Such "purposeful intent to avoid the truth" is legally sufficient to prove actual malice. *See, e.g., Harte-Hanks*, 491 U.S. at 668.

These circumstances create a plausible inference that discovery would provide clear evidence of actual malice. *See, e.g., Biro*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013) (actual malice may be inferred where "'the words or acts of the defendant before, at, or after the time of the communication' indicate that the defendant knew that his or her statement was or may well have been false.") (citation omitted). *See also Palin,* 2024 WL 3957617 at *31 (*citing Church of Scientology Int'l*

*v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001) for proposition that, "Judgment for defendants as a matter of law was unwarranted because a reasonable jury could believe" that defendant acted "with 'reckless disregard of the truth' by publishing the challenged statements after reading [material provided by plaintiff which court described as 'casting significant doubt'].")*. Brimelow v. New York Times* Co., 2021 WL 4901969 (2d Cir. Oct. 21, 2021), lends Defendants no aid, as unlike here, in *Brimelow*, there was no evidence that the defendant was aware of material that would have cast doubt on its narrative.

Also reinforcing the inference of actual malice is Sussman's bias. Sussman's "specialty as a reporter is to report sexual assault or harassment by persons of prominence—he never reports that such accusation of sexual misconduct was unfounded." Comp. ¶ 70. While preconceived narrative is not necessarily dispositive of actual malice on its own, where, as here, it provides a motive to distort the truth, it can be. For example, among the types of circumstantial evidence the *Biro* court listed as potentially indicative of actual malice is when a "defendant has a motive for defaming plaintiff." *Biro*, 963 F. Supp. 2d at 277. *Biro* makes clear that such biased motive need not be a function of "spite or ill will" and could also arise where a publisher sought "to change its image by instituting a policy of 'sophisticated muckraking,'" and may have been reckless in service of that goal. *See id.* at 277-278 (*quoting Curtis Publ'g Co v. Butts*, 388 U.S. 130, 158 (1975)). On the podcast, Sussman made clear he has made a name for himself as a reporter exposing "sexual misconduct allegations … that had gone seemingly unaddressed" and expressed pride in his ability to "make that difference." Podcast, 3:37, 4:48. His statements permit an inference of the type of motive—to advance his reputation as a reporter that exposes sexual predators—consistent with bias and thus supportive of actual malice.

Indeed, actual malice is assessed cumulatively, and the evidence to support actual malice can be based, in part, even on negligence. *See Airlie Found., Inc. v. Evening Star Newspaper Co.*, 337 F. Supp. 421, 429 (D.D.C. 1972) ("There is no doubt that evidence of *negligence*, of motive and of intent may

be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.") (emphasis added); *Celle.*, 209 F.3d at 183. Thus, for example, "evidence concerning motive" or bias *is* a relevant evidentiary building block toward proving actual malice. *Harte-Hanks*, 491 U.S. at 668; *Celle*, 209 F.3d at 183. Similarly, although a *failure to properly investigate* may not *alone* prove actual malice, it *is* one piece of evidence that can support a finding of actual malice. *See, e.g., Hunt v. Liberty Lobby*, 720 F.2d 631, 645 (11th Cir. 1983); *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971).

Finally, Defendants argue that their publication of Wang's denial somehow "rebut[s] [an] inference of actual malice." MOL at 18. But Defendants cite no authority for the notion that mere inclusion of a defamed person's denial or statement forecloses actual malice. The printing of a denial is simply one factor in the analysis. *See Biro*, 963 F. Supp. 2d at 283. In sum, the Complaint easily plausibly pleads that Defendants published the offending article with actual malice.

## CONCLUSION

For all of the reasons stated, Defendants' motion to dismiss should be denied.

Dated:     New York, New York
           September 16, 2024

                              Respectfully submitted,

                              CARTER LEDYARD & MILBURN LLP

By:           */s/ Alan S. Lewis*
              Alan S. Lewis
              Karen E. Meara
              28 Liberty Street, 41st Floor
              New York, NY 10005
              (917) 544-2524
              lewis@clm.com
              meara@clm.com

              *Attorneys for Plaintiff Liang Wang*

20