UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIANG WANG,<br><br>       Plaintiff,<br><br>   -against-<br><br>SAMMY SUSSMAN, VOX MEDIA, LLC, and NEW YORK MEDIA, LLC,<br><br>       Defendants. | 24-cv-3987 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

  Plaintiff Liang Wang was the principal oboist for the New York Philharmonic. *See* Dkt. 1 ¶ 1. He sued freelance reporter Sammy Sussman; Sussman's publisher, New York Media; and New York Media's parent company, Vox Media, for defamation. Wang's suit is about an article (and a podcast discussing the article) that he says wrongly depicts him as committing and being fired for a specific incident of sexual misconduct. He is seeking $100 million in damages. Defendants moved to dismiss. For the reasons stated below, the motion to dismiss is GRANTED.

## BACKGROUND

  The article that prompted this suit was published by *Vulture*, a platform of *New York* magazine, on April 12, 2024. Its headline reads: "A Hidden Sexual-Assault Scandal at the New York Philharmonic: Two musicians were fired for sexual misconduct. Why are they back with the orchestra?" Immediately above the headline is a photograph of the New York Philharmonic in concert. Three musicians' faces are enlarged and circled in red. One of the faces is Wang's; the others are Cara Kizer's and Matthew Muckey's.

  The article centers on a 2010 incident involving Wang, Muckey, and Kizer, all of whom were members of the orchestra at the time. The incident took place while the orchestra was in Vail, Colorado for a one-week residency. Dkt. 26-1 at 3. On the night in question, Wang, Muckey, and Kizer left a party thrown by one of their colleagues to go to Muckey's condo. *Id.*

  Here's how the article describes what happened next:

  When they got to Muckey's condo, he and Wang got in the hot tub and tried to persuade Kizer to join them, but she declined. Kizer alleged that Wang brought her a glass of red wine. Wang later told the police that Kizer got her own wine.

  What was not disputed is that Kizer has no memories of what happened after she drank from that glass.

*Id.* at 4.

The article goes on to relay Kizer's account of what happened that night. She says she passed out after drinking the wine, which she believes had been drugged. *See id.* at 5, 8. When she woke up the next morning, she was naked and in Muckey's bed. *Id.* at 5. After Kizer arrived at her own hotel room, "she realized that a tampon that she had put in the previous day had been pushed so far into her vagina she had trouble removing it." *Id.* Kizer claims Muckey raped her while she was passed out. *Id.* at 6.

Kizer reported what happened to the orchestra's personnel manager and then to the police. *Id.* at 5. The article's description of the police investigation notes:

> [Rusty] Jacobs[, the detective investigating Kizer's case,] spoke with six Philharmonic musicians and staff about Kizer, Muckey, and Wang. Several spoke highly of Kizer's credibility but raised questions about Muckey and Wang, with one male colleague stating that Muckey and Wang "think everything in the world is theirs for the taking." Jacobs asked whether they would be capable of drugging someone to commit a crime. "Yes," the man replied, "I could see that." By the time the residency ended, though, no charges had been filed and Muckey and Wang left town with the rest of the orchestra.

*Id.* at 6.

The article follows this up with an interlude about the orchestra's gender dynamics and the politics of its tenure system. *See id.* at 7-8. When the piece turns back to the Vail police, its focus is on their attempts to corroborate Kizer's claim that the wine she drank was drugged. The article says:

> In Vail, Jacobs got the results of the tests he had ordered, and there was a match: Muckey's DNA was found on Kizer's tampon. There was no evidence, however, that Kizer had been drugged. Wang denied that he had given Kizer anything, and Muckey continued to insist that the sex was consensual. Jacobs worried that his investigation had reached a dead end.

> Kizer began researching date-rape drugs. The ten-panel test she'd taken in Colorado didn't include a test for GHB, which produced symptoms similar to those she'd experienced the night of July 24, so Kizer sent a sample of her hair to a private lab. On February 9, 2011, she got the results. A six-centimeter hair sample was "positive for the presence of GHB." Later testing suggested the exposure occurred around the month of the alleged assault.

> "For me, it was like, 'Oh my God, this is it,'" Kizer said. She was more convinced than ever that she had been drugged.

> Jacobs sent the case file to the Fifth Judicial District Attorney's Office with a memo recommending that charges be filed, but the DA declined to prosecute Muckey. Jacobs was told that the hair-follicle test "did not meet the standards for litigation." (One forensic toxicologist called the practice of testing for date-rape drugs in hair follicles "controversial.")

> "I finally have this information, and now all these other people are screwing it up," Kizer said. "It felt like I was meeting such resistance, like this system didn't care that a crime happened to me, to my body." Kizer added that whether or not she'd been given GHB, her clear

> incapacitation—she was blacked out and moments away from vomiting—left her unable to consent to sex.

*Id.* at 8.

That's pretty much the end of the article's discussion of what happened in 2010. What comes next is Kizer's description of how the deputy district attorney communicated the non-prosecution decision to her and a comment from an attorney uninvolved with Kizer's case on the DA's decision not to prosecute. *See id.* at 8-9. Skipping forward eight years, the article continues:

> In early 2018, a few months after reporting about Harvey Weinstein's pattern of predation ignited the Me Too movement, the Philharmonic returned to the allegations Kizer made against Muckey. The organization hired Barbara S. Jones, a former federal judge, to conduct an independent investigation. In addition to Kizer's claims, the orchestra learned about [an] earlier rape allegation against Muckey and unrelated allegations of sexual misconduct against Wang. (Muckey and Wang denied the allegations.)
>
> Over a six-month, $336,573 investigation, Jones interviewed 22 individuals and reviewed "extensive documentary evidence." The Philharmonic concluded that the two men had "engaged in misconduct warranting their termination."
>
> Muckey and Wang were fired in September 2018. Nearly all the details of the investigation were withheld from the public. A New York *Times* article on the subject was headlined "New York Philharmonic Dismisses 2 Players for Unspecified Misconduct."

*Id.* at 9.

Both Wang and Muckey appealed their terminations, enlisting the help of their union to do so. *Id.* Their cases were turned over to a neutral arbitrator, Richard I. Bloch, whom the article describes as "a high-profile attorney, arbitrator, and part-time professional magician." *Id.*

Bloch reinstated Wang and Muckey. *Id.* at 10. The article notes that Jones's investigation had used a "preponderance of the evidence" standard to determine if Wang and Muckey were guilty of misconduct, while Bloch had relied on a higher "clear and convincing evidence" standard. *Id.* In describing the bases for Bloch's decision, the article quotes his arbitration opinion directly:

> [Bloch cited] the fact that the "events at issue occurred some 8, 10 and 12 years prior" and the "potential degradation of corroborative evidence over time." Because "sex acts are normally performed privately," he wrote, "the task of demonstrating assault charges, including those resulting from the refusal to take 'no' for an answer, can be difficult to prove."

*Id.* at 10.

As it draws to a close, the article presents statements from Wang's lawyer and Muckey's. *Id.* The piece also notes that a new collective-bargaining agreement between the Philharmonic and the musicians' union "forc[es] a 'preponderance of evidence' standard in all future arbitrations." *Id.* at 11.

3

It then ends by looking to the orchestra's future. On this it says, in part, "When he takes over, Gustavo Dudamel[, the orchestra's incoming music director,] will have a lot of work to do to repair the Philharmonic's culture. But even his best efforts likely won't change the reality that Muckey and Wang remain active in the ensemble." *Id.*

A little more than two weeks after the article was published, Sussman appeared on the "Inline G Flute" podcast hosted by Gareth Houston. Dkt. 1 ¶ 65. His interview primarily retraces the ground covered by the article, though he also supplies additional personal commentary. On the orchestra's 2018 investigation, the interview unfolds as follows:

| | |
|---|---|
| 00:22:10 Sammy Sussman | Yeah, sure. Um, so 2018, well, really October 2017, there's the reporting about Harvey Weinstein. |
| 00:22:16 Gareth Houston | Yeah. |
| 00:22:17 Sammy Sussman | Within a couple of months the New York Philharmonic commissions this outside invest—we don't know why they did that, to be clear. We don't know that it's tied to the Me Too movement, maybe it's a coincidence. |
| 00:22:25 Gareth Houston | Yes. |
| 00:22:26 Sammy Sussman | All we know is that by December of 2018 they had commissioned Barbara Jones. She's a former federal judge in New York, really an expert on these sort of things. She comes in, they spend over $300,000, um, on her investigation. She spends six months, according to some documents that I obtained, she interviewed 22 people. She reviews extensive document—documentary evidence. Um, and she finds there's enough evidence for the New York Philharmonic to rightfully terminate the employment of Matthew Muckey and Liang Wang. |
| 00:22:54 Gareth Houston | Yeah, due to the allegations of what happened in 2010, just to be clear, yeah. |
| 00:22:59 Sammy Sussman | And—Cara's allegation and another allegation against Muckey as described, and we say—we don't go into more specifics in the article and I, I, I won't—I'm not quite ready to do that here but, um, we do write mult—uh, allegations, so not one but multiple allegations, separate allegations— |

4

| | | |
|---|---|---|
| 00:23:12 | Gareth Houston | OK. OK. |
| 00:23:15 | Sammy Sussman | —of sexual misconduct against Liang Wang. So we know that he's present for Cara's allegation. She alleges that he poured her the glass of wine. We don't otherwise know his involvement, but we know that besides being present for that, there are at least two allegations against him— |
| 00:23:28 | Gareth Houston | OK. OK. |
| 00:23:30 | Sammy Sussman | —if that makes sense. Yeah. I, I don't want to say more than just multiple, but yes. |
| 00:23:32 | Gareth Houston | No, no, of course. Yeah, yeah. |

Dkt. 26-3 at 22:10-23:32.

The article was updated on April 16, 2024. Dkt. 1 ¶ 1 n.1. The update stated, "This story was originally published on April 12, 2024. Following publication, the New York Philharmonic announced that Matthew Muckey and Liang Wang, the two musicians accused of misconduct, are no longer rehearsing or performing with the orchestra." Dkt. 26-1 at 1.[1]

## LEGAL STANDARDS

To survive a motion to dismiss, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, the Court "accept[s] all factual allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Austin v. Town of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016). A district court may also consider documents attached to the complaint, incorporated by reference into the complaint, or integral to the complaint, so long as there is no dispute as to the documents' authenticity. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

Under New York law, a defamation plaintiff needs to show five things: "(1) a . . . defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the [defamed] party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (quoting *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000)).

---

[1] The article was further updated on November 5, 2024 to reflect Muckey's and Wang's dismissal from the Philharmonic after a separate investigation post-dating the events at issue in this case. Wang's claims do not involve this update.

5

"Whether particular words are defamatory presents a legal question to be resolved by the court[s] in the first instance." *Celle*, 209 F.3d at 177 (alteration in original) (quoting *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985)); *see also James v. Gannett Co.*, 353 N.E.2d 834, 837 (N.Y. 1976) ("[I]t is for the court to decide whether the words are susceptible of the meaning ascribed to them."). Though "[i]t is the responsibility of the jury to determine whether the plaintiff has actually been defamed, . . . a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." *Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) (internal citations omitted).

"[T]ruth is an absolute defense to a defamation claim." *Martin v. Hearst Corp.*, 777 F.3d 546, 552 (2d Cir. 2015). "But in certain circumstances even a technically true statement can be so constructed as to carry a false and defamatory meaning by implication or innuendo." *Id.*

## DISCUSSION

Wang claims that the article and podcast are defamatory in two ways. First, he says that they are defamatory because they contain false statements of fact. Second, he argues that they are defamatory by implication because they present "false suggestions, impressions and implications arising from otherwise truthful statements." *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 829 (N.Y. 1995).

The Court first examines whether Wang's complaint plausibly alleges any false statements of fact in either the article or the podcast. Then it turns to whether there's any substance to Wang's defamation-by-implication allegations. Neither side in this case disputes that New York defamation law applies.

### I. Express Defamation

Express-defamation claims—unlike defamation-by-implication claims—concern "direct statements." *Armstrong*, 649 N.E.2d at 829. These claims are about "allegedly false statements of verifiable fact." *Id*.

To survive a motion to dismiss, an express-defamation plaintiff "must plead that the defendant made specific false statements of fact." *Sorvillo v. St. Francis Preparatory Sch.*, 607 F. App'x 22, 24 (2d Cir. 2015). And "the court must decide whether the statements, considered in the context of the entire publication, are 'reasonably susceptible of a defamatory connotation.'" *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 42 (1st Dep't 2014) (quoting *Silsdorf v. Levine*, 449 N.E.2d 716, 719 (N.Y. 1983)).

When determining whether a statement is defamatory, three standards apply. First, "[c]hallenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Celle*, 209 F.3d at 177 (quoting *November v. Time Inc.*, 194 N.E.2d 126, 128 (N.Y. 1963)). Second, "[a] fair reading controls." *Id.* And third, "the words are to be construed not with the close precision expected from

lawyers and judges but as they would be read and understood *by the public to which they are addressed*." *Id.* (quoting *November*, 194 N.E.2d at 128).

Applying these standards, Wang fails to plausibly allege a claim of express defamation. He says the article and podcast make four false statements of fact: 1) Wang drugged Kizer; 2) Kizer drank a significant amount of the wine she alleged Wang gave her; 3) Kizer's drugging allegations were supported by evidence; and 4) Wang was fired by the orchestra in 2018 because of Kizer's allegations. Dkt. 1 ¶¶ 2-3, 43, 53.

As to the first statement, neither the article nor Sussman in his podcast interview says that Wang drugged Kizer. (The Court will get to whether the article or podcast *implies* that below.) What the article says is what the Court quoted in the background section: that "Kizer alleged that Wang brought her a glass of red wine. Wang later told the police that Kizer got her own wine." Dkt. 26-1 at 4. Sussman is even clearer in the interview. There he says, "[Kizer] and Wang dispute who poured a glass of wine." Dkt. 26-3 at 8:56.

Wang doesn't deny that Kizer made this allegation. Nor could he, since the police report notes that Kizer told them that "Wang gave her a glass of red wine." Dkt. 26-4 at 9. And nowhere in his complaint, briefing, or at oral argument did Wang point the Court to a place in either the article or the podcast that says that Wang in fact drugged Kizer.

In his complaint, Wang points to what the article "implies" as the basis for this claim. *See* Dkt. 1 ¶ 2 ("Specifically, the article implies that Wang put a date rape drug into Kizer's wine, so that Muckey could sexually assault her"); *id.* ¶ 42 ("Specifically, [the article] strongly implies that Wang drugged Kizer so that Muckey could rape her, tying Wang to what purportedly happened to Kizer with the headline."); *id.* ¶ 44 ("The article then strongly implies that Wang was the person who drugged Kizer."). But impressions and innuendo aren't enough for express defamation—what's needed is a point-blank false statement. *See Armstrong*, 649 N.E.2d at 829-30.

The same problem dogs the second statement with which Wang takes issue. The article never says that Kizer drank a significant amount of the wine that Wang purportedly gave her. Sussman doesn't make that claim during the podcast interview either.

The Court has already been over most of what the article says about what Kizer drank from the glass in question. *See* Dkt. 26-1 at 4 ("Kizer alleged that Wang brought her a glass of red wine. Wang later told the police that Kizer got her own wine."). The other place where the article mentions that glass of wine is in recounting what Kizer told her husband. *See id.* at 5 ("After her shower, Kizer told her husband about the glass of wine and how she woke up in Muckey's bed with no memory of the night before.").

None of these statements is about how much wine Kizer drank. Read in context, they say that she *did* drink from the glass of wine—which Wang doesn't say is false.

Sussman says substantially the same things on the podcast. *See* Dkt. 26-3 at 23:15, 8:56, 9:07. The only difference between what the article says and what Sussman says on the podcast is that at one point Sussman states, "[Kizer] drinks a glass of red wine and remembers nothing from the rest

of the night." *Id.* at 9:13. When understood in context, it's hard to see this comment as one about the amount of wine that Kizer drank, rather than one saying in colloquial terms (and remember, this was a podcast interview) that Kizer drank some wine from the glass. *See Celle*, 209 F.3d at 177 ("[T]he words are to be construed not with the close precision expected from lawyers and judges . . . ." (quoting *November*, 194 N.E.2d at 128)). Neither before nor after Sussman's statement does the conversation turn to how much wine Kizer drank—indeed, at no point in the hour-plus podcast does this happen.[2]

Wang claims that the statements are false because they omitted that Kizer told the police she drank "very little of the wine, probably a couple of sips." *See* Dkt. 1 ¶ 66 (quoting Dkt. 26-4 at 9). Again, that's a question of whether the article and podcast interview are defamatory by implication, not expressly so. *See Biro*, 883 F. Supp. 2d at 463-64 ("[Plaintiff's] allegations are based not on a defamatory connotation from statements in the Article that are alleged to be expressly false, but rather on an alleged defamatory implication that can be derived from the juxtaposition of certain statements with the omission of other allegedly material facts.").

Now turn to the third statement in contention. Wang says the article and podcast falsely claim that Kizer's allegations of drugging were backed up by evidence. This time, the article and Sussman's podcast interview make these claims. But they're not defamatory because they're true.

As the Court noted above, the article says, "A six-centimeter hair sample was 'positive for the presence of GHB.'" Dkt. 26-1 at 8. The quoted portion of the sentence is from the police report, which describes a positive test result from a hair sample Kizer sent to a private laboratory. Dkt. 26-4 at 46. The article's subsequent reference to "[l]ater testing [that] suggested the exposure occurred around the month of the alleged assault" is also taken from the police report. Dkt. 26-4 at 48 (noting expert opinion that lab reports "can only be interpreted as exposure to GHB in the presumed period"). Wang doesn't address that the statements quote the police report, nor does he suggest that the statements are actionable even though they're derived from the police report.

Turning to the podcast, two statements are relevant. First, Sussman says:

> A year later, um, Cara pays for a, a private, uh, hair exam, hair follicle exam. They test, they find a spike in GHB, and they can date it, because of the rate at which hair grows, to around the time of when Cara was in Vail. It's only to about the nearest month or two. So it's not at all indicative. She's told that that can't really be used in the criminal process and hair follicle testing at the time is new.

Dkt. 26-3 at 13:18. Then, midway through the interview, Sussman says:

> I, um, you know, Cara's story obviously felt compelling and just, I have this police evidence. It's one of those rare cases where there's such substantive police evidence, and it's such a specific crime, and you can point to the failures of the criminal process.

---

[2] It is further unclear how any statement concerning the amount of wine *Kizer* drank would be "of and concerning" Wang. *See Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) ("[A] defamation plaintiff must allege that the purportedly defamatory statement was 'of and concerning' him or her . . . .").

Dkt. 26-3 at 36:55.

Wang fails to allege that any of these statements are untrue. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 247 (2d Cir. 2017) ("Because falsity is an element of New York's defamation tort, and 'falsity' refers to material not substantially true, the complaint in this case must plead facts that, if proven, would establish that the defendant's statements were not substantially true.").

Wang says in his complaint that the "notion" that the test Kizer took was "indicative of the presence of GHB" is "dubious and far from scientifically reliable." Dkt. 1 ¶ 17. To support this claim, he refers to Sussman's statement on the podcast that the drug test could not be used in the criminal process and that it was "not at all indicative" of GHB. *Id.* Wang further pleads that "the law enforcement records and the arbitration reveal instead that there was *no credible scientific basis* for the purely speculative notion that Kizer was drugged." *Id.* ¶ 49. On this, he points out that during the arbitration the Philharmonic's expert toxicologist wouldn't testify as to the presence of date-rape drugs based on only a hair test, that Kizer's positive drug test wasn't of evidentiary value, and that another drug test Kizer took produced "unintelligible" results. *Id.* ¶ 50.

To start, the article itself notes that the positive test "did not meet the standards for litigation." Dkt 26-1 at 8. And, based on the context in which it was made, Sussman's statement that the drug test was "not at all indicative" of GHB references that the drug test dated any GHB exposure only to the nearest month—a qualification that was also included in the article.

More importantly, none of what Wang pleads would render the article's statements about the drug test false. Wang's claim seems to be that the article's reporting of the drug test is false and therefore defamatory because it doesn't include further information that would provide the appropriate context. *See* Dkt. 1 ¶¶ 17, 49-50.

With that, we're back in the realm of implication. To be sure, a plaintiff can make out an express-defamation claim based on the inferences flowing from "allegedly 'false statements of verifiable fact.'" *See Levin*, 119 F.3d at 196 n.5 (quoting *Armstrong*, 649 N.E.2d at 829). But as the Second Circuit has explained, "false suggestions, impressions and implications arising from otherwise truthful statements" are a different type of defamation (again, defamation by implication) from that based on "allegedly 'false statements of verifiable fact, with inferences flowing from those facts.'" *Id.* (quoting *Armstrong*, 649 N.E.2d at 829). Even if everything Wang pleads in his complaint were true, none of what the article reports about the drug test would therefore be false.

Wang's claim as to the podcast is on even shakier ground. As noted above, Wang relies on what Sussman said about Kizer's positive drug test on the podcast to support his theory that the article's reporting of the issue was defamatory. So it's hard to see how the same discussion by Sussman on the podcast could both show that the article was defamatory and be defamatory itself. Setting that puzzle aside, Wang faces the same problem with the podcast as he did with the article: he hasn't plead that anything Sussman said during the podcast about Kizer's drugging allegations was false. He doesn't deny that the test showed "a spike in GHB … around the time of when

9

[Kizer] was in Vail … to about the nearest month or two." Dkt. 26-3 at 13:18. Nor is there any dispute that the drug test was part of the police's investigation and so was "police evidence." *See id.* at 36:55. Wang rests his argument on omissions that he characterizes as "false and misleading." *See* Dkt. 43 at 7. But that, again, is a matter of defamation by implication—not express defamation.

Finally, we come to the fourth statement. Here Wang says that the article and podcast falsely report that he was fired from the Philharmonic in 2018 because of Kizer's allegations. Again, the Court will address whether the article or podcast implies this below. Sticking to the question of express defamation, Wang doesn't identify anything in either the article or the podcast that makes this claim explicitly.

Go back to the article's discussion of Wang's firing, which the Court recounted in the background section. Of particular importance is the article's statement, "In addition to Kizer's claims, the orchestra learned about the earlier rape allegation against Muckey and unrelated allegations of sexual misconduct against Wang." Dkt. 26-1 at 9.

This sentence doesn't comment on the grounds for Wang's firing. Instead it's about the course of the orchestra's investigation. Even Wang himself seems to acknowledge that this statement can't be stretched into one of express defamation—in his complaint he pleads only that the article gives readers "the false impression" that Wang was fired based on Kizer's accusations. Dkt. 1 ¶ 45.

The same holds true for the podcast. The back-and-forth between Sussman and the podcast's host is quoted in the background section, so the Court won't repeat it here. Wang's complaint points to the discussion at 22:54 in the podcast, where Houston, the podcast's host, asks Sussman to confirm whether Muckey and Wang were terminated due to Kizer's 2010 allegations. *Id.* ¶ 67. Wang says Sussman "answered affirmatively" despite knowing that Wang was fired for distinct sexual misconduct allegations. *See id.*

Read (or rather, heard) in context, Sussman's answer wasn't a "yes." Once again, this was a podcast interview with the host and Sussman speaking conversationally and interrupting each other at times. As the transcript shows, Sussman's answer first references "Cara's allegation and another allegation against Muckey" and then notes that there were "multiple allegations, separate allegations . . . of sexual misconduct against Liang Wang." Dkt. 26-3 at 22:59-23:15. This isn't a false statement about why Wang was fired—the affirmation to which Wang points is part of Sussman's longer explanation, which specifically notes the "separate allegations" against Wang. *See Celle*, 209 F.3d at 177 ("Challenged statements are not to be read in isolation, but must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." (quoting *November*, 194 N.E.2d at 128)). Sussman certainly could have been clearer when he spoke. But that doesn't make what he actually said false and thereby defamatory.

## II.     Defamation by Implication

"Defamation by implication 'is premised not on direct statements but on false suggestions, impressions and implications arising from otherwise truthful statements.'" *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 145 (S.D.N.Y. 2022) (quoting *Armstrong*, 649 N.E.2d at 829).

10

New York courts require the plaintiff to "make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov*, 987 N.Y.S.2d 37 at 44; *see also Udell v. NYP Holdings, Inc.*, 94 N.Y.S.3d 314, 317 (2d Dep't 2019); *Partridge v. State*, 100 N.Y.S.3d 730, 735 (3d Dep't 2019); *Bisimwa v. St. John Fisher Coll.*, 149 N.Y.S.3d 428, 434 (4th Dep't 2021); *Henry*, 629 F. Supp. 3d at 145. The latter requirement is measured by an "objective" standard that "asks whether the plain language of the communication itself suggests that an inference was intended or endorsed." *Stepanov*, 987 N.Y.S.2d at 44.

This standard recognizes the First Amendment interests that weigh against stretching defamation-by-implication liability too far. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993). Because a defamation-by-implication claim is based on truthful statements—that is, statements that are protected by the Constitution—a court should be wary of stepping into an editor's shoes. "Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1306 (8th Cir. 1986) (en banc).

Wang says the article and podcast have two defamatory implications: that Wang drugged Kizer and that the Philharmonic fired Wang because of Kizer's allegations. *See* Dkt. 43 at 4, 6.[3] Neither can proceed.

Start with Wang's claim that the article falsely implies he drugged Kizer. First, the article can't be reasonably read to imply this. As the Court already noted, the article presents Kizer's allegation that Wang gave her a glass of wine, taking care to note that Kizer's allegation was just that. *See* Dkt. 26-1 at 4. Most importantly, the article goes on to say that Wang told the police that Kizer got her own wine. *Id.* And then, the article leaves it there—it makes no attempt to resolve the dispute in either Wang's or Kizer's favor. *See* Dkt. 26-1 at 4; *see also Martin*, 777 F.3d at 553 (denying defamatory implication where article reported that plaintiff was arrested and criminally charged and "[r]easonable readers understand that some people who are arrested are guilty and that others are not"); *Bisimwa*, 149 N.Y.S.3d at 435 ("[While] additional information . . . would

---

[3] Here it's worth picking up on two allegations addressed in the previous section of the opinion: alleged defamation concerning the amount of wine Kizer drank and about the evidentiary basis for Kizer's drugging claims. Wang doesn't address these under the defamation-by-implication rubric, and so those arguments are waived. But even if he did address the issue, the article and podcast can't be reasonably understood as implying anything about the amount of wine—significant or otherwise—that Kizer drank. The same goes for the article's portrayal of Kizer's drugging claims. A reasonable reader would understand that there was disagreement about the reliability of Kizer's positive drug test because the article explicitly notes both that the hair-follicle test was inadmissible in court and that a forensic toxicologist had called hair-follicle testing "controversial." *See* Dkt. 26-1 at 8. So too for the reasonable podcast listener, given that Sussman acknowledges the weaknesses of the positive drug test Kizer received. *See* Dkt. 26-3 at 13:18 (noting that the drug test couldn't "really be used in the criminal process," was "not at all indicative" of the timing of any potential GHB exposure, and was "not that specific"). And as to both allegations, Wang doesn't come close to meeting the intent-or-endorse requirement.

have provided further context for the truthful information that was conveyed, the [allegedly defamatory statement] did not imply anything false about plaintiff.").

Contrast this case with a hypothetical offered by the Second Circuit in *Herbert v. Lando*:

> If, for example, a newspaper account of a rash of neighborhood thefts also reported that a public figure had recently moved into the neighborhood, purchased tools commonly used in burglaries, and had been seen near a number of homes where burglaries had occurred, a reader would be led to believe that the individual described had committed the crimes.

781 F.2d 298, 307 n.4 (2d Cir. 1986). As this hypothetical makes clear, defamation by implication is primarily concerned with implication that arises from selective juxtaposition or omission. *See White v. Fraternal Ord. of Police*, 909 F.2d 512, 520-21 (D.C. Cir. 1990). In comparison, Wang tries to locate an implication in the article that the article's literal text—namely the inclusion of Wang's denial—refutes.

Even if one were to read the article as suggesting Wang drugged Kizer, Wang hasn't shown that this inference is one Sussman wanted readers to draw. That argument is undercut by the words of the article itself. Again, the article reports Kizer's allegations *as allegations*—it uses the verb "alleged" in describing them. *See* Dkt. 26-1 at 4. In the sentence that immediately follows, the article provides the reader with Wang's side of the story. This is the opposite of "endorsing" Kizer's version. *See Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 173 (S.D.N.Y. 2021) (denying that author intended defamatory implication where article also provided plaintiff's refutation of the allegation reported); *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 661 F. Supp. 3d 159, 175-76 (S.D.N.Y. 2023) (same).

Wang points to the article's other features, such as its headline, the photo that ran with it, and its inclusion of various statements by Kizer and other orchestra members about Wang. *See* Dkt. 1 ¶¶ 41-44. He says Sussman inserted these details to reinforce the implication that Wang drugged Kizer. *Id.* To be fair, some of what the article includes about Wang isn't flattering. Most relevant is that the article notes that an orchestra member answered "Yes" when asked by the investigating detective "whether [Wang and Muckey] would be capable of drugging someone to commit a crime." Dkt. 26-1 at 6. Wang doesn't complain that this recounted discussion with another orchestra member was in any way false. And given that the article explicitly includes that Wang told the police Kizer poured her own glass of wine, there's not enough here to show that Sussman wanted his readers to think Wang drugged Kizer.

The same goes for the podcast interview, where Sussman specifically notes that "[Kizer] and Wang dispute who poured a glass of wine." Dkt. 26-3 at 8:56. Once again, when addressing Kizer's allegation that Wang poured the wine, Sussman frames it as her allegation—an allegation Wang doesn't dispute Kizer made. *Id.* at 8:56-9:07; *see also id.* at 23:15 ("[Kizer] alleges that [Wang] poured her the glass of wine. We don't otherwise know his involvement . . . ."). And, just as in the article, Sussman also describes Wang's version of events. *Id.* at 9:07 ("Wang says that the glass of wine is closer to [Kizer] . . . .").

12

Now turn to the article's discussion of Wang's firing (and Sussman's statements on the podcast). Particularly important is the sentence: "In addition to Kizer's claims, the orchestra learned about the earlier rape allegation against Muckey and unrelated allegations of sexual misconduct against Wang." Dkt. 26-1 at 9. Wang reads this sentence as implying that the Philharmonic investigated (and fired) Wang for "unrelated allegations of sexual misconduct" *and* "Kizer's claims."

However, the "plain language" of the statement and its context indicates that it is at worst a sloppy sentence, not an intended defamatory innuendo. *See Stepanov*, 987 N.Y.S.2d at 44. First off, there's no question that the orchestra's investigation involved both Muckey and Wang, so it's unsurprising that the article mentions them together when discussing the investigation. As for the sentence in question, the paragraph of which it's part begins by referencing "the allegations Kizer made *against Muckey*." Dkt. 26-1 at 9 (emphasis added). With that frame, the sentence refers back to "Kizer's claims," but when addressing Wang, it refers specifically to "unrelated allegations of sexual misconduct." *See id.* Even if the article could have been clearer, it references the "unrelated allegations" against Wang, which Wang doesn't dispute were in fact the basis for his 2018 termination.

Where courts have held that a defendant endorsed or intended a defamatory implication, the signs of intent have been much clearer. For instance, in *Partridge v. State*, the Third Department held that the State Police had defamed the plaintiff by falsely implying that the plaintiff had sexually exploited a child. *See* 100 N.Y.S.3d at 733, 737-38. The defamation turned on the police's reference to the plaintiff in a press conference about an initiative "championed by the Internet Crimes Against Children Task Force, which was established to investigate and prosecute crimes involving the online sexual exploitation of children." *Id.* at 733 (internal quotations omitted). During the conference, the superintendent spoke about the arrests made because of the initiative while standing in front of "a large sign that depicted a child looking at a computer and included the words, 'Internet Crimes Against Children.'" *Id.*

In determining that the State Police had intended to imply that the plaintiff had been arrested for sexual exploitation of a child, the court looked to the police's inclusion of the plaintiff's photograph in an array of over sixty other photographs also presented during the conference. *Id.* at 736. Aside from the plaintiff, all of the people pictured "were either Internet criminals or sexual predators [with] most of the sexual crimes involv[ing] children." *Id.* (internal quotations omitted). And the court noted that the labels beneath the photographs that stated the crimes for which the individuals pictured were arrested weren't visible to the public during the conference. *Id.* at 737; *see also Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 162 (S.D.N.Y. 2020) (finding intent where defendant's statement that plaintiff committed sexual abuse was made in direct response to statements by others that plaintiff was not fired for sexual harassment); *cf. Kesner*, 515 F. Supp. 3d at 188 (finding no defamation by implication where nothing apart from the challenged statement—a "sparse tweet"—showed endorsement).

Unlike the poster in *Partridge*, the article supplies its readers with ready access to the truthful information. Wang doesn't deny that the orchestra fired him for the separate sexual misconduct

13

allegations the article and podcast mention; what he objects to is the *way* in which the article reported about why he was fired. But no court has ever held that a defendant intended a defamatory implication where the defendant also promptly relayed true statements that undercut the false suggestion. That's for good reason. As the Eighth Circuit identified nearly four decades ago, courts shouldn't be in the business of telling reporters *how* to say what they want to say. *See Janklow*, 788 F.2d at 1306.

The same holds true for the podcast. While Sussman's statements aren't the model of clarity, they also don't indicate that Sussman wanted listeners to think Wang was investigated for Kizer's allegations. *See* Dkt. 26-3 at 22:59-23:15. When Sussman is describing the allegations against Wang, he doesn't omit that Wang was investigated for "multiple . . . separate allegations." *Id.* at 22:59. And when he discusses Kizer's allegations, Sussman takes care to note that Wang was "present for [Kizer's] allegation" and that "We don't otherwise know his involvement." *Id.* at 23:15. Those statements don't evince an intent to imply that Wang was fired for Kizer's claims; if anything, they seem to indicate that Sussman is trying, albeit unsuccessfully, to differentiate the allegations against Wang and those Kizer made against Muckey. To make a showing of intent, Wang needs more.

## CONCLUSION

For these reasons, defendants' motion to dismiss is granted. The Clerk of Court is directed to terminate Dkt. 23 and close this case.

SO ORDERED.

Dated: January 13, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge